**STATE of Missouri, Respondent,**

v.

**Timothy J. STRAUSS, Appellant.**

No. 53905.

Missouri Court of Appeals,
Eastern District,
Division Two.

June 13, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 25, 1989.

Application to Transfer Denied
Dec. 12, 1989.

Irl B. Baris, St. Louis, for appellant.

William L. Webster, Atty. Gen., Elizabeth L. Ziegler, Asst. Atty. Gen., Jefferson City, for respondent.

GARY M. GAERTNER, Judge.

Defendant Timothy Strauss appeals from his convictions by a jury of first degree assault, RSMo § 565.050 (1986), and armed criminal action, RSMo § 571.015 (1986), for which he was sentenced to concurrent five and three year sentences. On appeal defendant argues that the trial court erred in (1) overruling his motion to specifically enforce a plea agreement allegedly entered into between defendant and the State; (2)

ruling that defendant was competent to stand trial; (3) denying defendant's objection to the State's use of peremptory challenges to remove persons that knew individuals with mental illnesses; and (4) refusing to voir dire the jury regarding publicity during the trial. We affirm.

Defendant and Sandra Bock dated for three years prior to their breakup in December 1985. In December 1985, defendant told the victim, Ted Kettman, that he would kill Kettman if he tried to date Bock. Bock began dating Ted Kettman in January 1986. From January 1986 through March 1986 defendant harassed and threatened Kettman because he continued to date Bock. Bock's parents received harassing phone calls.

On March 11, 1986, Bock and Kettman surreptitiously entered into Bock's basement bedroom in order to conceal Kettman's presence from Bock's parents. Shortly before midnight, Bock's parents received approximately seven phone calls from defendant. During one of the calls defendant stated that Kettman was in the Bock's house. Kettman hid in the closet when Bock's parents came downstairs. Kettman left the house after Bock and her parents went upstairs. Shortly after midnight, defendant called again and stated on the Bock's answering machine: "I am going to get him now. He is dead."

Eric Evans accompanied defendant in defendant's truck that night. Defendant told Evans that he wanted to kill Kettman. Defendant also stated that Kettman would discover that his tires were slashed and that defendant would fight Kettman if defendant saw Kettman walking. After leaving the Bock residence, Kettman indeed discovered that his tires had been slashed and he began to walk home. As Kettman was walking down the street, defendant drove past and Kettman screamed, "Come back, I have a score to settle with you." Defendant got out of the truck and yelled back at Kettman, "Bring it on."

As the two approached each other, defendant began swinging a baseball bat which he had concealed behind his back. Kettman ran in the opposite direction then tried

to block defendant. Appellant struck Kettman on the forearm with the bat. Kettman tried to disarm defendant, but defendant struck Kettman on the side of the head, breaking the bat in half. During the struggle Kettman punched defendant in the face. Defendant stabbed Kettman in the thigh with a hunting knife and also cut Kettman on the neck. Kettman ran from defendant with defendant chasing him and screaming at him. Kettman stopped at the Bickel home and screamed for someone to let him in. Robert Bickel turned on the porch light and called the police. When Bickel turned on the light, defendant fled to his truck.

After being arrested, defendant stated to police that he knew Kettman was at the Bock's home, Kettman's car had several flat tires and that Kettman would be walking home. Defendant further stated that he saw Kettman walking down the street and that he yelled at Kettman. Defendant admitted striking Kettman with the baseball bat and engaging in a fist fight. Near the scene of the assault, police found a broken bat and a leather sheath for a knife.

Kettman suffered numerous injuries. He received a one and one-half inch laceration on his scalp which required stitches, a superficial laceration on his neck which required stitches, a hematoma above his left elbow, and a two and one-half inch deep stab wound on his left thigh. The jury found defendant guilty as charged and sentenced him to five years imprisonment for the assault and three years imprisonment for armed criminal action. The trial court ordered the sentences to be served concurrently.

■ In his first point on appeal, defendant argues that the trial court erred in refusing to specifically enforce a plea agreement allegedly offered by the State, accepted by defendant, and approved by the court. Prior to trial defendant filed a motion to specifically enforce the plea agreement. After a hearing on the motion, during which defense counsel testified regarding negotiations with the State, the trial court denied the motion. No one testified on behalf of the State.

Defense counsel testified that he had several preliminary discussions with the State in September and October 1986 regarding the possible disposition of the charges pending against defendant. On November 3, 1986, assistant prosecutor Mooney offered to reduce the charge to assault in the first degree, a class B felony, recommend an SIS with five years probation, and that defendant pay $3,000 in restitution to the victim, serve sixty days in jail, undergo counseling, and agree not to contact the victims, in exchange for defendant's guilty plea. Defense counsel requested that there be a pre-sentence investigation and that defendant be allowed to enter an *Alford* plea. *See North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Mooney responded that defense counsel should talk to prosecuting attorney Westfall regarding the PSI and that their office would take no position as to the *Alford* plea. On November 4, 1986, Mooney told defense counsel that a pre-sentence investigation could be made.

Defense counsel informed defendant of the offer which defendant agreed to on November 7, 1986. On December 1, 1986, defense counsel advised Judge Wiesman that an agreement had been reached for disposition of all the cases against defendant. Defendant's case was set for December 8, 1986. When defense counsel called to inform defendant of the setting, he learned that defendant had attempted suicide on November 28, 1986, and was in a hospital psychiatric ward. Defendant filed a motion for psychiatric evaluation. Dr. Ebrahim Amanat was appointed and submitted his report on February 3, 1987.

On February 9, 1987, Mooney contacted defense counsel and informed him that the State was willing to proceed on the November 3, 1986 offer, provided that the matter be disposed of before the end of February. Mooney contacted defense counsel on March 9, 1987, to inquire because the disposition was to have taken place before the end of February. Defense counsel explained that he had informed assistant prosecutor Parisi in February that defendant would go ahead with the agreement

and that the conference was set for March 17, 1987. At the March 17 conference defense counsel told the court that he was concerned about defendant pleading guilty when the psychiatrist's report indicated appellant had mental problems. The case was assigned to Judge Stussie who stated that the psychiatric question would not be a bar to his acceptance of the plea. In reviewing the terms of the agreement with Judge Stussie, Parisi stated that the State was opposing the *Alford* plea and that if defendant insisted upon it, the State would not reduce the charge from the Class A felony to the Class B felony.

Defense counsel contacted Mooney the next day, March 18, 1987. Defense counsel stated that defendant and the court were ready to proceed on the plea agreement except for the State's position on the *Alford* plea. After reviewing his files, Mooney stated that although the State had previously taken the position of "no position" on the *Alford* plea, the State was opposing the *Alford* plea and insisting that the case be disposed of in two days. On March 20, 1987, Mr. Parisi contacted defense counsel and stated that as part of the offer there would be no PSI, and the sixty days confinement had to start on March 25, 1987. On April 1, 1987, Parisi called defense counsel and stated that unless defendant pleaded the next day the charge would not be reduced and defendant would be indicted for armed criminal action. Defense counsel stated that the matter could not be disposed of the next day because defendant was in the hospital due to further mental problems. On April 6, 1987, defendant was indicted for armed criminal action.

Defendant argues that an agreement had been entered into between the State and the defendant which was acceptable to the court, but that the State decided to change the terms of the agreement after it had been made. We do not agree with defendant's reading of the record. For defense counsel's testimony reveals that the February 9, 1987, offer by Mooney required that defendant plead before the end of February. Defendant did not plead before the end of February, therefore no offer re-

mained to be accepted. Subsequent discussions between defense counsel and the State constituted negotiations. We do not believe that the record supports defendant's contention that an agreement was entered into.

■ Furthermore, any agreement reached by defense counsel and the State would have merely been an executory agreement the breach of which does not deprive an accused of liberty or any other constitutionally protected interest unless said agreement is embodied in the judgment of a court. *Mabry v. Johnson,* 467 U.S. 504, 507, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984). A number of jurisdictions have held that a defendant may not receive specific performance of an executory plea agreement. *See e.g., People v. Williams,* 45 Cal.3d 1268, 248 Cal.Rptr. 834, 857–58, 756 P.2d 221, 244 (1988); *People v. Navarroli,* 121 Ill.2d 516, 118 Ill.Dec. 414, 521 N.E.2d 891, 894 (1988); *People v. Gallego,* 430 Mich. 443, 424 N.W.2d 470, 472–73 (1988) (unauthorized non-plea agreement with police officers); *People v. Hood,* 62 N.Y.2d 863, 477 N.Y.S.2d 621, 622, 466 N.E.2d 161 (1984). We hold that the court's refusal to enforce an executory agreement, even if it existed, did not prejudice the substantial rights of the defendant for the agreement had not been embodied in the judgment of the court. Point denied.

■ In his second point defendant argues that the trial court erred in finding defendant competent to stand trial. Defendant presented the testimony of Dr. Amanat at a hearing on defendant's competence. Dr. Amanat testified that defendant was manic depressive and not competent to stand trial. The State presented the testimony of psychologist Dr. Robert Carafiol. Dr. Carafiol diagnosed defendant as a paranoid schizophrenic but concluded that defendant was competent to stand trial. Dr. Carafiol did not find defendant unaware or out of touch. Carafiol testified that defendant fundamentally knew right from wrong behavior.

The preliminary determination as to whether a defendant is competent to pro-

ceed to trial is exclusively within the discretion of the trial court. *State v. Abrams,* 597 S.W.2d 230, 232 (Mo.App., E.D.1980). In making this determination the trial court considers its own observations as well as the testimony of witnesses. *Id.* The trial court was faced with conflicting evidence regarding defendant's competence to stand trial. The trial court concluded that defendant was competent to proceed. In light of the testimony of Dr. Carafiol, the trial court's ruling was not against the weight of the evidence. Rather, Dr. Carafiol's testimony constituted substantial evidence sufficient to support the trial court's ruling. The trial court acted within its discretion in concluding defendant was competent to stand trial. *Id. See also State v. Bradshaw,* 593 S.W.2d 562, 567 (Mo.App., W.D.1979). Point denied.

■ In his third point defendant argues that the State's use of peremptory challenges to exclude veniremen having contact with persons suffering from mental disorders violated the tenets of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). During voir dire the State inquired to discover whether members of the venire had friends or relatives that had psychiatric problems. The State used five of its peremptory strikes to remove veniremen who had stated they knew people or had relatives that had psychiatric problems. Defendant objected to the State's use of peremptories based upon *Batson.*

*Batson* requires an initial showing that the defendant is a member of a cognizable racial group and that the prosecutor used his strikes to remove veniremen of that racial group. *Batson,* 106 S.Ct. at 1723. Defendant has not alleged that he is a member of a cognizable racial group, thus he has failed to make the threshold showing pursuant to *Batson.* Defendant has cited no persuasive authority nor do we find any compelling reason to extend the tenets of *Batson* to a heretofore unprotected class. And, as noted by the State, were we to hold that defendant was a member of a protected class, defendant failed to show the State removed members of that class.

Rather, the State only removed veniremen who knew members of that class. Point denied.

■ In his final point, defendant argues that the trial court erred in failing to voir dire the jury regarding whether they had been exposed to media publicity during the trial. During the trial defense counsel brought to the attention of the trial court that two articles regarding the trial had appeared in the Post–Dispatch and a radio newscast had aired on KMOX. The trial court refused to voir dire the jury for defendant failed to show that any of the jurors had violated the court's admonishment against reading newspaper articles, listening to radio broadcasts and viewing television reports. The court further found that the newspaper articles contained nothing more than the statements of witnesses and comments of counsel that were before the jury. At each break and before recessing for the day the court consistently admonished the jury and read MAI–CR3d 300.04.

■ Ruling on motions to voir dire the jury after it has been sworn rests within the sound discretion of the trial court. *State v. Lee,* 654 S.W.2d 876, 879 (Mo. banc 1983). If during the trial members of the jury are exposed to publicity, the trial court must initially determine whether the publicity creates a danger of substantial prejudice to the accused. *State v. Stith,* 660 S.W.2d 419, 424 (Mo.App., S.D.1983). The trial court stated that the two newspaper articles contained nothing other than a summarization of what had happened at trial. The trial court further determined that polling the jury regarding the publicity might highlight the article in the morning paper and lead to speculation. Further the KMOX newscast was not shown to be prejudicial. We believe the court was within its discretion to deny the motion where the record is devoid of any prejudice to the defendant. The trial court in effect ruled that the newspaper articles were nonprejudicial and defendant was unable to point to any prejudicial articles or reports or instances of a juror's violation of the trial court's admonition. Point denied.

**596**

We affirm defendant's conviction and sentence.

GRIMM, P.J., and KAROHL, J., concur.