**STATE of Missouri, Respondent,**

v.

**Richard F. BROWN, Appellant.**

No. WD 55422.

Missouri Court of Appeals,
Western District.

Submitted Feb. 16, 1999.

Decided May 25, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 29, 1999.

Application for Transfer Denied
Aug. 24, 1999.

Elizabeth U. Carlyle, Lee's Summit, for appellant.

John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

Before SMART, P.J.; HANNA and LAURA DENVIR STITH, JJ.

JAMES M. SMART, Jr., Judge.

Richard Brown was convicted after a jury trial of one count of second degree murder, § 565.021.1(2), RSMo 1994,[1] and one count of second degree assault, § 565.060.1(4), arising out of Brown's actions while operating a vehicle on Missouri Highway 63. Pursuant to § 558.016, Brown was found to be a prior offender.[2] He was sentenced to consecutive terms of twenty-five years' imprisonment and five years' imprisonment, respectively. Brown raises six points of error, challenging his murder and assault convictions.

The judgment of the trial court is affirmed.

## Factual Background

On the evening of December 13, 1996, Derek Perry and his fiancée, Erica Scott, were driving south on Highway 63 to Jefferson City, Missouri. Mr. Perry, a first year law student at the University of Missouri–Columbia, had finished his last final exam of the semester that morning. After completing his exam, Mr. Perry and Ms. Scott went Christmas shopping in Columbia, Missouri, before heading home to Jefferson City. In Jefferson City, at approximately 5:30 p.m. that same evening, Richard Brown realized he had lost his checkbook. Brown set out for his bank in Columbia, driving a white four-door Mitsubishi Diamante.

Also that evening, Ken Weider and his family were driving south on Highway 63 from Columbia to Jefferson City. Mr. Weider came upon a white, four-door car traveling between 40 and 45 miles per hour, weaving in and out of the left and right lanes. He opted to slow down and stay behind the white car rather than immediately pass it. Eventually, Mr. Weider successfully passed the white car, and reset his cruise control at 68 miles per hour.

About a mile and a half from where he had originally passed the white car, Mr. Weider noticed the white car quickly approaching from behind. Mr. Weider testified that he was traveling "right at 70 [miles per hour]," when the white car passed him in the left lane. As the car passed him, Mr. Weider noted that the first three numbers of the license plate were 8P4. Mr. Weider saw the white car cross the center median, turn north, and begin to travel up the northbound exit for Ashland, Missouri. The white car then stopped, backed out across the northbound

---

1. All statutory references are to the Revised Statutes of Missouri, 1994, unless otherwise indicated.

2. In the five years preceding the trial, Brown had been convicted of driving while intoxicated three times. Therefore, under § 558.016, this offense of driving while intoxicated was punishable as a class D felony.

lanes of Highway 63 and proceeded north. At this point, Mr. Weider, alarmed by the actions of the white car, exited the highway and called 911 to report what he had seen.

Also around 8:00 p.m. that same evening, Michael Jordan was traveling on northbound Highway 63 toward Columbia. While driving northbound, Mr. Jordan "[saw] some headlights swerve ... some sparks ... and then [he saw] some smoke." Mr. Jordan testified: "I [saw] a white four-door car, it was in the air. It flipped in the air, landed on its wheels, into the rock embankment." Mr. Jordan stopped his car and ran across the southbound lanes toward the white car to see if he could help. As he approached the car, he saw a man "put his airbag back in." He then saw the driver "put his car in reverse and back up and [take] off back down the road."

Mr. Jordan watched the white car travel down southbound Highway 63. He testified that the white car "swerved back off the road, and then came back on [and] almost hit another car." Mr. Jordan ran back to his car and drove to the first turnaround, intending to follow the white car. By the time he had made his way back to where he had originally seen the car, he discovered that the white car had run up a guardrail. When Mr. Jordan approached the car to make sure the driver was all right, he smelled an odor of alcohol "so strong that it reeked."

Peggy Henore was traveling southbound on Highway 63 at approximately 8:00 p.m. Ms. Henore testified that as she was traveling, she noticed a lot of debris in the road. After she passed through the debris, she saw a white car driving on the guardrail, "with two wheels on the road and two wheels up on the guardrail." Ms. Henore called 911 from her cellular phone to report the incident.

Danny Sattler, a Missouri State Highway Patrolman, responded to a Columbia Police Department dispatch regarding a vehicle that was driving "careless and imprudent" on Highway 63. Trooper Sattler testified that upon arriving at the accident scene, he observed Derek Perry's vehicle in a ditch, facing east. Mr. Perry was on the ground. Ms. Scott was near him, sitting upright. Both were being attended to by medical personnel. The trooper also observed a white bumper with a Missouri license plate, a white mirror, and other items in the debris.

Derek Perry was pronounced dead at the scene of the accident. Dr. Jay Dix, the Boone County Medical Examiner, testified that Mr. Perry had died "as a result of blunt impact injuries, with multiple injuries, internal injuries specifically of the heart and lungs." A drug screen of Mr. Perry's urine and blood was negative. Erica Scott was also thrown from the car and suffered multiple injuries. Ms. Scott remained in the hospital for several days. As a result of the accident, she broke both of her wrists; had scars on her face, neck, stomach, back and legs; had staples put in the back of her head; and her teeth were pushed so far back into her head that she was unable to eat.

At the accident site, Mr. Jordan approached Trooper Sattler and pointed out the white car straddling a guardrail some distance ahead. Trooper Sattler advised Trooper Ralph Lemongelli about the white car and asked him "to go to that location to find out what was going on down there." After the original accident scene had been secured, Trooper Sattler approached the white car to find out what was happening. He testified that the white "vehicle looked like it had been overturned. There was damage to almost every part of the vehicle's body." Trooper Sattler noticed that the front bumper of the car was missing and that there was red "transfer paint" on the vehicle's hood and the driver's side rear quarter panel. After removing some of the red transfer paint from the car, Trooper Sattler returned to the scene of the original accident where he seized a white outside mirror that appeared to be from the white Diamante and a vodka bottle that had been found at the scene.

Additionally, Trooper Candy Cornman found a green day planner and three pill bottles, labeled Alprazolam, Zoloft and Acetaminophen, identified as belonging to Defendant Brown, on the shoulder of the road, near the red vehicle.

As Trooper Lemongelli approached the white Diamante, he saw a man trying to retrieve a leather case from the right rear floorboard. Trooper Lemongelli asked the man for his driver's license or his name. When the man did not respond, the trooper ran the vehicle's license plate number and learned that the vehicle was registered to Richard Brown. Trooper Lemongelli asked the man if he was Richard Brown, to which Brown replied affirmatively.

While Trooper Lemongelli was checking the license plate number, Brown was looking for something in a brown briefcase and asked the trooper if he could smoke. Brown told the trooper that he had hit a slick spot on the road, throwing his car to the left, then the right and finally to the guardrail. When speaking with Brown, Trooper Lemongelli detected "a strong cologne type odor ... and then a strong odor of intoxicants." Trooper Lemongelli noticed that Brown had scrapes on the left side of his face, but did not see any other apparent injuries to Brown's head. Brown's pupils were of equal size, and his eyes were "glassy and staring."

Trooper Lemongelli administered several field sobriety tests to Brown. Brown performed poorly on each of these tests, according to the trooper. After administering the field sobriety tests, Trooper Lemongelli concluded that Brown was too impaired to be operating a motor vehicle and placed him under arrest for driving while intoxicated. Brown was transported to the hospital in an ambulance. Trooper Lemongelli followed Brown to the hospital, where Brown consented to a blood test. Brown's blood test revealed a blood alcohol content of .12 percent by weight. Brown's blood sample also revealed the presence of Alprazolam, commonly referred to as Xanax, a depressant used for sedation and the treatment of high anxiety. The evidence indicated that when Alprazolam and alcohol, also a depressant, are taken in conjunction, one enhances the depressive effects of the other.

While filling out an Alcohol Influence Report Form, Trooper Lemongelli asked Brown whether he had any physical defects, whether he was ill, or whether he had epilepsy or diabetes. Brown answered all of those questions negatively. Brown stated he had been to the dentist recently for gum surgery and was taking antibiotics, an antidepressant and some type of antihistamine. When asked whether he had been involved in an accident that evening, Brown replied, "Well, obviously."

Dr. Matthew Hart, the emergency room physician who treated Brown, testified that Brown "smelled of [an] intoxicating substance, suspiciously of alcohol" and spoke with slurred speech. Although Dr. Hart asked Brown a series of routine questions about Brown's medical and health history, Brown mentioned no neurological afflictions. While he could not recall directly examining Brown's tongue the evening of the accident, Dr. Hart identified a photograph of Brown's tongue, which showed swelling and trauma to its left lateral side. Dr. Hart admitted that such trauma could have caused Brown to slur his speech. Dr. Hart testified that Brown had "difficulty answering ... questions at a rapid rate, or typical rate. His thought process was dulled and slowed."

Brown was charged with the Class A felony of murder in the second degree (felony murder) and the Class C felony of assault in the second degree while operating a vehicle with criminal negligence. The felony underlying the felony murder charge was the Class D felony of driving while intoxicated.

Upon arriving at the scene of the accident, Corporal Scott Simmons, an accident reconstructionist, observed a fluid trail which led from Mr. Perry's vehicle "continu[ing] southbound on 63, at one time running back into the ditch, coming out of the ditch, and continuing on to where the

[white] vehicle came to rest on the guard-rail." Because Ms. Scott had been asleep at the time of the collision, and was unable to provide an account of the incident, Corporal Simmons utilized the physical evidence to form a hypothesis. He concluded that both cars were southbound at the time of the collision. Brown's car struck the rear of Mr. Perry's vehicle. At the time of contact, the bumper of Brown's car became engaged with Mr. Perry's car. The greater momentum of Brown's car caused it to swing out, and the bumper ripped from Brown's car. ` At that point, Mr. Perry's car struck the rock bluff, causing it to bounce a different direction, back into the roadway, while sliding sideways. Brown's car ran into a ditch, then came out, swayed across the highway, and ended up on the guardrail. Mr. Perry's car turned over twice, landing upside down. As the vehicle rolled, Mr. Perry was ejected, the trooper hypothesized.

A jury convicted Brown of both second degree murder and second degree assault. He was sentenced as a prior offender to consecutive terms of twenty-five years' imprisonment and five years' imprisonment, respectively. Brown appeals.

## I. Felony Murder Instruction

Brown's first point on appeal relates to Jury Instructions 8 and 9. The trial court gave the jury the following instructions:

### INSTRUCTION NO. 8

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that defendant committed the offense of driving while intoxicated, as submitted in Instruction No. 9, and

Second, that the defendant caused the death of Derek Perry by colliding with a vehicle in which Derek Perry was an occupant, and

Third, that Derek Perry was killed as a result of the perpetration of that driving while intoxicated

then you will find the defendant guilty under Count I of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.

If you do find the defendant guilty under Count I of murder in the second degree, you will assess and declare one of the following punishments:

1. Life imprisonment
2. Imprisonment for a term of years fixed by you, but not less than ten years and not to exceed thirty years.

### INSTRUCTION NO. 9

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about the 13th day of December, 1996, on U.S. Highway 63, at or near 1.6 miles south of Route A, in the County of Boone, State of Missouri, the defendant operated a motor vehicle, and

Second, that he did so in an intoxicated condition,

then you will find that the defendant has committed driving while intoxicated.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all these propositions, you cannot find that the defendant has committed driving while intoxicated.

As used in this instruction, the term "intoxicated condition" means under the influence of a combination of alcohol and a drug or drugs.

### A. *Preservation of Error*

■ During the instruction conference, Brown objected to Instruction 8, claiming it was not supported by the evidence. In his motion for new trial, Brown objected to the felony murder instruction, claiming that it was improper in that he should have

been charged with involuntary manslaughter, rather than felony murder. Brown argued that driving while intoxicated was not a felony that could support felony murder, because the jury was not presented with evidence of Brown's prior DWI convictions enabling it to find Brown committed an underlying *felony*. On appeal, Brown now claims that the trial court erred by giving jury instructions 8 and 9 because they "failed to require the jury to find that [Brown] had a culpable mental state." Brown contends the instructions violate §§ 562.016.1, 562.021.2 and 562.026 "by permitting him to be convicted without proof of a culpable mental state of an offense for which the statute defining the offense does not clearly indicate a purpose to dispense with the requirement of a culpable mental state."

█ In response to the state's contention that the error has not been preserved, appellant points to the fact that defendant requested an instruction on mental disease or defect (based on MAI–CR3d 38.03) which includes language indicating to the jury, after defining mental disease or defect, that if the jury is not convinced that defendant "knowingly" caused the death of Derek Perry, the jury must acquit the defendant on grounds of mental disease or defect. Defendant argues that because this proffered instruction included language addressed to the "knowingness" of defendant's actions in causing the death of Mr. Perry, the trial judge would have realized that defendant would have had a similar concern related to instructions 8 and 9. We disagree. The instruction on mental disease and defect is a specialized instruction, given only when a defendant has raised the issue of mental disease or defect and offered some substantive evidence thereon. It is completely separate and apart from the concept that a culpable mental state must be shown as part of the offense in question.

█ Indeed, neither alcoholism nor voluntary intoxication constitute a defense to a charge involving a specific culpable mental state. § 552.010 RSMo 1994;

§ 562.076.3 RSMo 1994; *State v. Nicklasson,* 967 S.W.2d 596, 617 (Mo. banc 1998). Thus the instruction on mental disease or defect is not applicable to a case of voluntary intoxication. The trial court would not have seen the two issues as related. In fact, the judge stated that she did not believe there was evidence of a mental disease or defect. Defendant also argues that the judge must have been aware of defendant's contention concerning culpable mental state because the judge stated that no particular mental state was necessary to commit the homicide, but that "as to the underlying felony, that's probably true." This remark, rather than showing the judge was aware of defendant's current claim of error, shows the opposite: that the judge did not understand that defendant was making the claim defendant now makes on appeal. In fact, it shows that if such an argument *had* been made, the court may have been initially receptive to the argument. Consequently, we conclude that defendant's contention on appeal was not preserved.

## B. *Standard of Review*

█ Brown does not expressly request plain error review. In any event, "unless a claim of plain error facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted,' this court will decline to exercise its discretion to review for plain error under Rule 30.20." *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995). Here, we find nothing which on its face suggests substantial grounds to believe that manifest injustice or a miscarriage of justice has resulted.

█ A point on appeal must be based upon the same theory as the objection made at trial. *State v. Jones,* 515 S.W.2d 504, 506 (Mo.1974). "No ground for error based upon the objection now voiced has been laid. The grounds of error may not be asserted for the first time in this court." *Id.; see also State v. Sibley,* 411 S.W.2d 187, 189 (Mo.1967). Brown may not now

broaden the scope of his objection beyond the objection made to the trial court. *State v. Paglino,* 319 S.W.2d 613, 624 (Mo. 1958). Therefore, Brown's first claim of error was not preserved for appeal. We deny Point I.

## II. Determination of Felony Driving While Intoxicated

■ Brown next complains that the trial court erred in overruling his motions for judgment of acquittal as to Count I and for a new trial because there was insufficient evidence before the jury that he committed a felony. Brown points out that the judge, and not the jury, found that he had prior alcohol-related driving offenses that raised the level of his driving while intoxicated offense to a felony. Specifically, Brown claims that his constitutional rights to have a jury find each element of the offense beyond a reasonable doubt was violated by the judge's determination. U.S. CONST. amends. VI and XIV; Mo. CONST. art. 1, §§ 1 and 10; *United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

Brown is arguing, in effect, that the jury instructions improperly omitted language requiring a jury finding of his persistent offender status.

During the instruction conference, the following exchange occurred:

THE COURT: Let me ask if the Defendant has an objection, a specific objection to that instruction on felony murder.

[Defense]: If I am looking at the right instruction.

THE COURT: That is correct. And together with it goes the underlying felony instruction on driving while intoxicated. And I will make a finding that the Court finds beyond a reasonable doubt that the Defendant has three prior alcohol-related driving offenses and was represented by counsel in each of those offenses and was convicted of each of those offenses. One I believe in the Circuit Court of Boone County; is that correct?

[Prosecution]: Yes.

THE COURT: One in Howard County? And one in the Municipal Court of Booneville.

[Prosecution]: That's correct.

THE COURT: *And I will make those specific findings in the record so that I find that the State has presented at least sufficient evidence for the Court to submit the underlying felony of felony driving while intoxicated.*

*Now does the Defendant have a specific objection to the felony murder instruction?*

[Defense]: The objection is, and I didn't make this at the time, maybe I should now, at the close of all the evidence, Defendant would make an oral Motion for Judgment of Acquittal.

THE COURT: Well, you may do that in the courtroom, but I'm going to overrule that. Understanding I'm overruling that.

[Defense]: And understanding that, and because you overruled it, that makes it stand, and for that reason I'm objecting, because I'm thinking that this particular instruction should not be given, because *the evidence doesn't support it.*

(Emphasis added). In his motion for new trial, Brown argued that:

[i]n order for the jury to rightfully convict one of a felony murder, it must first find or determine that there was a commission or attempt [sic] commission of an underlying felony, and there was never any evidence presented to th[e] jury to allow it to make such a finding, because all the evidence presented to th[e] jury was that the Defendant committed the offense of Driving While Intoxicated, but that charge alone, is not a Class D felony....

■ "Counsel shall make specific objections to instructions or verdict forms considered erroneous." Rule 28.03. The failure to make a specific objection constitutes a waiver. *State v. Martindale,* 945 S.W.2d

669, 673 (Mo.App.1997). When directly asked whether he had a specific objection to the felony murder instruction, Brown objected that "the evidence does not support it." It appears from this objection that Brown was making an objection to the sufficiency of the evidence rather than objecting to the trial court's determination of his persistent offender status. In his motion for new trial, it is not clear whether Brown is complaining that there was not sufficient evidence before the jury to support his conviction or whether he was complaining that the trial court, and not the jury, determined his persistent offender status. To the extent he is complaining that the jury was not asked to make the determination as to the prior alcohol-related offenses, he is objecting to the fact that the issue was not submitted to them. Because we cannot determine that Brown specifically preserved an objection to the failure to submit the prior convictions to the jury, and because we cannot determine that he preserved that claim of error in his motion for new trial, we conclude that Brown's claim of error has not been preserved on appeal. *State v. Brisco,* 934 S.W.2d 335, 336–37 (Mo.App.1996).

■ Likewise, Brown's constitutional claim has not been preserved for appeal. Brown's contention that the judge's determination of his persistent offender status violated the constitution is raised for the first time on appeal. Failure to specifically raise a constitutional challenge at the earliest opportunity means that the challenge is not preserved for our review. *State v. Chambers,* 891 S.W.2d 93, 103–04 (Mo. banc 1994).

■ To the extent that Brown may be saying that the state failed to prove the three prior alcohol-related offenses, we disagree. The evidence shows that there was substantial evidence of the prior offenses.

### III. Sufficiency of the Evidence – Felony Murder

■ Brown next argues that the trial court erred in denying his motion for ac-

quittal as to felony murder at the close of all the evidence because there was no legally sufficient evidence that his intoxication was the cause of the collision. In assessing a challenge to the sufficiency of the evidence, we view the evidence, together with the reasonable inferences drawn therefrom, in the light most favorable to the jury's verdict. *State v. Grim,* 854 S.W.2d 403, 405 (Mo. banc 1993). All evidence and inferences contrary to the verdict are ignored. *Id.* We look only to whether there is sufficient evidence from which a reasonable person could have found the defendant guilty beyond a reasonable doubt. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). We do not weigh the evidence. *State v. Villa–Perez,* 835 S.W.2d 897, 900 (Mo. banc 1992). The determination of a witness' credibility is a function of the jury, and it is within the jury's province to believe all, some or none of a witness' testimony. *State v. Wynn,* 391 S.W.2d 245, 247 (Mo.1965).

Several witnesses testified regarding Brown's extremely erratic driving shortly before the accident. Others testified that immediately following the accident, Brown smelled of alcohol, and his eyes were glassy and staring. Trooper Lemongelli testified that Brown failed four separate field sobriety tests. The jury heard that Brown had a blood alcohol content of .12 percent by weight, and that in addition to alcohol, Brown's blood contained Aplrazolam, a drug that, when combined with alcohol, increases the depressive effects of the alcohol. There was also evidence that, approximately a week after the collision, Brown told a co-worker that he drank a pint of vodka on the evening of the collision. Thus, there was abundant evidence that Brown was driving while intoxicated.

There was also evidence from which a reasonable juror could find that while he was driving while intoxicated, Brown caused Derek Perry's death by colliding with Mr. Perry's car. At trial, Corporal Simmons, an accident reconstructionist, posited that Brown's car struck Mr. Per-

ry's car from behind, traveling at a great rate of speed. Corporal Simmons testified that the impact of this collision caused Mr. Perry's car to hit a rock embankment at the side of the road, bounce back into the roadway and overturn twice, throwing Mr. Perry from his car. Corporal Simmons further testified that he based his theory on the following factors: 1) a fluid trail leading from the site of the accident to Brown's car; 2) various items of debris at the accident site from both cars (including Brown's front bumper, side-view mirror, day planner and prescription medication); and 3) the resulting damage to both cars and skid marks on the roadway.

Brown argues that no one witnessed the actual accident and the State failed to prove that some action on his part caused the accident. We disagree. The jury could have reasonably inferred from the witnesses' descriptions of Brown's chaotic driving immediately prior to the accident that Brown was driving extremely erratically and at a high rate of speed at the time the accident occurred.

We believe that based upon the evidence adduced at trial, and the reasonable inferences drawn therefrom, a reasonable juror could have found that Brown was driving while intoxicated and that Brown drove his car into the back of Mr. Perry's car, causing an accident which resulted in Mr. Perry's death. Point III is denied.

## IV. Sufficiency of the Evidence – Count II

■ Brown also argues that the trial court erred in overruling his motion for judgment of acquittal as to Count II (the felony assault) because the state did not present sufficient evidence to show that his criminal negligence caused the accident. We review this claim under the same standard enumerated in Point III.

Count II charged Brown with assault in the second degree, § 565.060. "A person commits the crime of assault in second degree if he ... [w]hile in an intoxicated condition or under the influence of controlled substances or drugs, operates a motor vehicle ... and, when so operating, acts with criminal negligence to cause physical injury to any other person than himself[.]" § 565.060.1(4), RSMo 1994. A person is criminally negligent "when he fails to be aware of a substantial and unjustifiable risk that circumstances exist or a result will follow, and such failure constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." § 562.016.5, RSMo 1994.

In order to convict Brown of assault in the second degree, the jury was required to find that Brown was driving while intoxicated; that Brown caused physical injury to Erica Scott by colliding with the vehicle in which Ms. Scott was an occupant; and that Brown was thereby criminally negligent. As we previously discussed in Point III, there was sufficient evidence before the jury that Brown was driving while intoxicated and that his car collided with Mr. Perry's car. Therefore, our discussion under this Point is limited to whether there was sufficient evidence before the jury that Brown was criminally negligent.

■ "Mental state is rarely capable of direct proof." *State v. Rowe*, 838 S.W.2d 103, 111 (Mo.App.1992). Proof of a requisite mental state is usually established by circumstantial evidence and permissible inferences. *State v. Brown*, 660 S.W.2d 694, 699 (Mo. banc 1983). In determining whether the defendant possessed the requisite mental state, the jury may look at evidence of and draw inferences from the defendant's conduct before the act, during the act and after the act. *State v. Johnson*, 770 S.W.2d 263, 267 (Mo. App.1989). Specifically, evidence of Brown's conduct minutes before the accident is relevant and material to whether Brown was acting negligently at the time of the accident. *See State v. Feger*, 340 S.W.2d 716, 721–22 (Mo.1960).

Witnesses testified that immediately before the accident, Brown was driving erratically. He was unable to maintain a constant speed, traveling first at 40–45

miles per hour and then, minutes later, at 70 miles per hour. His car was swerving and weaving on the highway. He crossed a median from southbound to northbound Highway 63 and began driving up the northbound exit for Ashland, Missouri. Changing his mind, he backed his car down the exit and across the northbound lanes of traffic before proceeding northbound. At one point he flipped his car, and the car's airbag deployed. Rather than stop driving, however, Brown punched the airbag down, restarted the car, and continued driving. Brown hit Derek Perry's vehicle, and then pulled up out of a ditch and attempted to drive further, until he drove his car up a guardrail.

"Such driving constitutes a conscious disregard of an unjustifiable risk and a gross deviation from the standard of care that a reasonable person would use. The resulting [accident] demonstrates the risk and the consequences of disregarding it." *State v. Applewhite,* 771 S.W.2d 865, 868 (Mo.App.1989). Given the evidence before it, we believe that the jury could have reasonably inferred that Brown's erratic driving caused the accident which resulted in Ms. Scott's injuries. Point IV is denied.

## V. Mental Disease or Defect

■ Additionally, Brown claims that the trial court erred in refusing to give his requested Instruction B because the evidence raised the issue of mental disease or defect sufficiently to require that the jury be permitted to consider whether mental disease or defect prevented Brown from having the requisite culpable mental state for the offense of assault in the second degree. Brown's requested Instruction B read, "You may consider evidence that the defendant had or did not have a mental disease or defect in determining whether the defendant had the state of mind required to be guilty of murder in the second degree." The trial court refused to give the jury this instruction on the ground that there was no evidence of a mental disease or defect which could negate a required culpable mental state.

■ The defendant is presumed to be without a mental disease or defect which would exclude him from responsibility for his conduct. § 552.030.6, RSMo 1994. The defendant has the burden of establishing he indeed suffers from a mental disease or defect which exculpates him from criminal responsibility. *State v. Moss,* 789 S.W.2d 512, 514 (Mo.App.1990).

■ The trial court has considerable discretion when ruling on whether to allow the defense of mental disease or defect. *State v. Isa,* 850 S.W.2d 876, 886 (Mo. banc 1993). However, once substantial evidence of a mental disease or defect has been introduced, "[t]he issue of whether [the defendant] had a mental disease or defect excluding responsibility for his conduct is one for the trier of fact . . . ." § 552.030.6, RSMo 1994. Substantial evidence is sufficient evidence from which the trier of fact could have reasonably decided the issue. *State v. Peoples,* 962 S.W.2d 921, 924 (Mo. App.1998). Thus, our query in this case is whether Brown presented substantial evidence of a mental disease or defect, warranting the submission of Instruction B to the jury.

The defense presented some witnesses whose testimony suggested that Brown had a history of seizures. Dr. Edgar Ailor, an ear, nose, and throat specialist, testified he was called to the emergency room at Columbia Regional Hospital on December 6, 1996, a week before the collision in question, to see Brown because of "lacerations of both the right and left side of his tongue[ ][a]nd active bleeding from his tongue." Dr. Ailor applied eight sutures to the left side of Brown's tongue and four sutures on the right. Brown told Dr. Ailor that Brown's injuries were the result of a seizure Brown had had earlier in the day.

Dr. Donald Delwood, Brown's family physician, had seen Brown two months earlier, on October 10, 1996, because Brown reported a seizure. Dr. Delwood testified that his initial hypothesis was that the seizure was due to Brown's "two- or

three-month history of … fairly radical changes to his medications." Dr. Delwood attempted to stabilize Brown's medications to see if the seizures stopped. When Dr. Delwood was informed of the December 6 seizures, he referred Brown to Dr. Allen Sher, a neurologist, to determine whether Brown suffered from a seizure disorder.

Dr. Sher first saw Brown on December 10, 1996, three days before the collision in question. At this time, Brown told Dr. Sher about two seizures, which Dr. Sher associated with alcohol cessation. Dr. Sher ordered an EEG of Brown's brain waves. Although the results of the EEG showed no signs of seizure activity, Dr. Sher testified that this did not mean that Brown did not have seizures. Dr. Sher saw Brown again on December 17, 1996, four days after the collision. Brown told Dr. Sher that he had had no additional seizures since December 6, 1996. Dr. Sher ordered another EEG, which again returned no signs of seizure activity.

On January 8, 1997, Brown presented Dr. Sher with a distinctly different history of his seizure activity as well as a summary of his legal problems stemming from the December 13, 1996, accident. Brown told Dr. Sher that he had had "many blackouts in the past" and that the blackouts were not related to drinking alcohol. Based upon this information, Dr. Sher prescribed Dilantin, an anti-seizure medication, for Brown. Dr. Sher ordered an MRI scan of Brown's brain, which showed nothing out of the ordinary.

Dr. Sher testified that it was possible Brown could have experienced a seizure and not known about it. When asked his "medical opinion as to whether or not … Brown could have experienced a seizure on December the 13th at the time of th[e] accident," Dr. Sher replied, "I believe it's possible."

Ms. Lora Linneman, Brown's mother, and Mr. Timothy Johnson, Brown's roommate, described incidents during which Brown's body became rigid, he began to shake and became unresponsive. Mr. Johnson also said that on December 13, 1996, he drove past the site of the accident. When he realized Brown was involved, he stopped. Mr. Johnson testified that when he approached Brown, he noticed Brown was rigid and unresponsive.

Dr. Hart, the emergency room physician who treated Brown after the accident testified that Brown's actions at that time (difficulty with verbalization, dulled thought processes) were consistent with the possibility that Brown had suffered a seizure earlier. However, he also testified that there was a long list of other possible explanations for Brown's actions including "a long list of medicines, concussion and trauma." Dr. Hart never expressed an opinion that Brown suffered a seizure on December 13, 1996.

A mental disease or defect is defined as "any mental abnormality regardless of its medical label, origin, or source," MAI–CR 3d 308.03, and includes "congenital and traumatic mental conditions as well as disease." § 552.010, RSMo 1994. Mental diseases and defects do *not* include "alcoholism *without psychosis* or drug abuse *without psychosis* …." *Id.* (Emphasis added). "Psychosis" is defined as "[a] severe mental disorder in which the patient departs from the normal pattern of thinking, feeling, and acting. There is generally a loss of contact with reality." BLACK's LAW DICTIONARY 1227 (6th ed.1990). Section 552.010 specifically excludes alcohol or drug abuse from the definition of "mental disease or defect" unless it is accompanied by a severe mental disorder, evincing the legislature's intent to include only those conditions attributable to a severe mental disorder within the definition of "mental disease or defect."

None of Brown's medical witnesses testified that Brown's seizures were the result of any sort of mental abnormality or disorder. No medical witnesses offered an opinion that Brown had a seizure on December 13, 1996. Brown's regular physicians attributed Brown's seizures to alcohol cessation and radical changes in his medication. There is no evidence in the

record that any of the physicians ever considered Brown's seizures to be caused by a mental disorder. No physician, neurologist or otherwise, offered an opinion, based on reasonable medical certainty, taking into account all factors consistent with the possibility of a seizure disorder, that Brown had any mental or neurological defect causing him to have a seizure at the time of the collision on December 13, 1996. If Brown did have a seizure on December 13, 1996, he fails to present evidence that it was not related to voluntary intoxication. We conclude that Brown failed to present evidence which would entitle him to an instruction on mental disease or defect.

## VI. Testimony of Corporal Simmons

■ Brown finally argues that the trial court erred in failing to *sua sponte* grant a continuance or declare a mistrial when Corporal Simmons admitted that his testimony had changed from that given at his deposition. During his deposition, Corporal Simmons testified that at the time of the collision, Mr. Perry's vehicle was straddling the center line and that the skid marks on the pavement came from the front, right tire of Mr. Perry's vehicle and one of Brown's tires. However, at trial, Corporal Simmons testified, based upon his accident report, that both vehicles were traveling in the same lane of travel and that the skid marks were "probably from the left tire of the maroon [Perry's] vehicle."

■ Because Brown did not object to the introduction of Corporal Simmons' testimony or request a continuance or a mistrial, he failed to preserve this claim of error for our review. *See State v. Lane,* 613 S.W.2d 669, 681 (Mo.App.1981). We could review this point only under the plain error standard of review, which would dictate that Brown be afforded relief only if "the action of the trial court was not only erroneous, but that the error so substantially impacted upon his rights that manifest injustice or miscarriage of justice [would] result if the error [was] left uncorrected." *State v. Hornbuckle,* 769 S.W.2d 89, 93 (Mo. banc 1989). Plain error is

rarely found in a trial court's failure to take action *sua sponte. State v. Owens,* 849 S.W.2d 581, 586 (Mo.App.1993).

At trial, Brown extensively cross-examined Corporal Simmons regarding the change in his testimony. Corporal Simmons told the jury that he had a made a mistake during his deposition testimony and proceeded to explain the mistake. Corporal Simmons admitted that when he attested that the transcript of his deposition was accurate, he knew it was not. He testified that when he brought the matter to the attention of the prosecutor, the prosecutor told him that if the transcript accurately reflected what Corporal Simmons had actually said at his deposition, then he should sign it, even if it were factually wrong.

Realizing that Corporal Simmons' change in testimony could fit one of his defense strategies, Brown did not raise an objection. He did not request that the trial court exclude the testimony; he did not request a continuance to provide an opportunity to address the change in testimony; nor did he request that the trial court declare a mistrial. Instead, he effectively impeached Corporal Simmons regarding the change in testimony. He now asks that we find that the trial court erred in not *sua sponte* offering remedies that Brown himself did not request.

■ The prosecution was in error in instructing the witness to sign the transcript without noting the changes. This error was apparently in good faith. We fault the prosecution, however, for not informing the defense of Corporal Simmons' change in testimony. "[A] party intending to use an expert witness at trial must disclose the fact that the witness has changed his opinion...." *City of Joplin v. Flinn,* 914 S.W.2d 398, 401 (Mo.App. 1996). Let us be clear about the fact that there is a duty on the part of a litigant not to intentionally mislead the other side. However, while we admonish the prosecution for this lapse, we do not believe the state's breach of this duty of disclosure

entitles Brown to a new trial. *State v. Davis,* 556 S.W.2d 45, 48 (Mo. banc 1977). Reversal is required only where "the ... testimony could ... in any reasonable likelihood have affected the judgment of the jury." *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). Whether the defendant was prejudiced by the state's failure to disclose depends on the nature of the charge, the evidence presented by the state and the role that the non-disclosed evidence would likely have played, had it been disclosed. *State v. Dayton,* 535 S.W.2d 469, 478 (Mo.App. 1976).

Here, the defense would have already been aware of an inconsistency in Corporal Simmons' testimony because the accident report that Corporal Simmons prepared after the accident stated that the skid mark in question was caused by the left rear tire of Mr. Perry's car. Brown had been furnished a copy of this report. Brown, presumably, was already prepared to cross-examine Simmons concerning this contradiction with his deposition testimony. The testimony of the witness at trial concerning the location of the Perry vehicle at the time of collision allowed an effective impeachment and cross-examination. Nothing in the record indicates that the impeachment would have been any more effective for the defense if the defense had had advance notice of the change. Indeed, the failure of the prosecution to mention it before trial may have enabled the defense to gain more momentum from the trooper's change in testimony.

■ It is not the trial court's function to help counsel try their cases; consequently, a trial judge should act *sua sponte* only in exceptional circumstances. *State v. Drewel,* 835 S.W.2d 494, 498 (Mo.App. 1992). We do not believe that this case is such an "exceptional circumstance." Because Brown's own counsel did not respond to the change in Corporal Simmons' testimony with a request for exclusion, a continuance or a mistrial, we cannot say that it was error for the trial court not to *sua sponte* order the same. Point VI is denied.

## Conclusion

For all the foregoing reasons, Brown's convictions for second degree murder, § 565.021.1(2), and second degree assault, § 565.060.1(4), are affirmed.

HANNA and LAURA DENVIR STITH, JJ. concur.