**STATE of Missouri, Respondent,**

v.

**John J. WILLIAMS, Jr., Appellant.**

**No. WD 56380.**

Missouri Court of Appeals,
Western District.

April 11, 2000.

Motion for Rehearing and/or Transfer to
Supreme Court May 30, 2000.

Application for Transfer Denied
Aug. 29, 2000.

Scott E. Walter, Special Public Defender, Ladue, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before: SMART, P.J., and ELLIS and EDWIN H. SMITH, JJ.

EDWIN H. SMITH, Judge.

John J. Williams, Jr., appeals the circuit court's judgment of his jury convictions for felony murder in the second degree, § 565.021;[1] endangering the welfare of a child in the first degree, § 568.045; and armed criminal action (ACA), § 571.015, for which he was sentenced, as a prior offender, §§ 558.016, 558.019, 557.036, RSMo Supp.1996, to consecutive terms of imprisonment of life, five years, and twenty-five years, respectively, in the Missouri Department of Corrections.

The appellant raises five points on appeal. In Point I, he claims that the trial court erred in overruling his motions for judgment of acquittal at the close of the State's evidence and all the evidence be-

---

1. All statutory references are to RSMo 1994, unless otherwise indicated.

cause there was insufficient evidence to support his conviction of felony murder in that the State's medical evidence did not establish that his striking of his son with a belt, the act constituting the underlying felony of endangering the welfare of a child, caused his death. In Point II, he claims that the trial court erred in overruling his *Batson* objection to the State's use of a peremptory strike to strike a member of the venire because it deprived him of his constitutional right to be tried by a fair and impartial jury in that the reasons given by the State for striking the venireman, specifically, that he was divorced, were not constitutionally neutral reasons for doing so. In Point III, he claims that the trial court erred in submitting Instruction No. 11, the verdict director for the offense of ACA, § 571.015, based on a conviction for the underlying felony of felony murder, because: (1) the State failed to show that he committed the underlying felony by, with, or through the use of a dangerous instrument or deadly weapon, as required by § 571.015 and defined in § 556.061(9), (10), in that the belt used by the appellant in the commission of the underlying felony was not a dangerous instrument or deadly weapon as defined by statute; and (2) § 571.015 is constitutionally infirm as being overbroad and void for vagueness in that it does not give adequate notice and fair warning as to what acts constitute armed criminal action. In Point IV, the appellant claims that the trial court erred in overruling his objection to the State's closing argument concerning the force necessary to cause the belt, which was used by the appellant to strike the victim, to fray because it deprived him of his constitutional right to a trial before a fair and impartial jury in that this argument referred to evidence not in the record. In Point V, he claims that the trial court erred in overruling his pretrial motion to dismiss the felony murder charge, based on the application of the "merger doctrine," because the alleged acts constituting the underlying felony, endangering the welfare of a child, merged with the acts that were alleged to have caused the death of the victim in that the striking of the victim by the appellant with a belt not only was alleged to have constituted the underlying felony, but was alleged to have caused his death.

We affirm.

### Facts

On May 29, 1997, the appellant picked up his two-year-old son, Michael A. Scott, from day care between 4:15 and 4:30 p.m. He then picked up Michael's mother, Deborah Blake, from her job, and they returned to their home. The appellant had moved in with Deborah, Michael, and James Stewart, Michael's older half-brother, then twelve years old, approximately six to eight months prior to that date. After dropping Michael and his mother off at their house, the appellant went to the store to buy some cigarettes. James came home from school while the appellant was gone. When the appellant returned, the mother informed him that Michael had wet his pants. Michael had previously been potty trained, but had regressed. The appellant asked Michael why he had wet his pants. When Michael did not respond, the appellant told him, "You know what is going to happen." At this point, James went into his bedroom because he did not like to see Michael get "whipped." The appellant then stripped Michael below the waist and struck him with a black leather belt. James could hear Michael screaming and crying and the appellant striking him with a belt for between fifteen and twenty minutes. Deborah also went to her bedroom while the appellant was striking Michael.

After the appellant finished striking Michael with the belt, Michael went into James's bedroom and James put some clothes on him. He then took Michael into the living room and gave him to Deborah who had also come out of her bedroom. While watching television, Deborah held Michael. She told Michael to wake up and

asked him some questions. James observed Michael respond to her by nodding his head and moving. The mother then left the living room to go to the restroom. Sometime soon thereafter, the appellant told the mother that Michael's heart had stopped beating.

The mother and the appellant decided to drive Michael to Children's Mercy Hospital. On the way to the hospital, they passed a fire station and decided to stop there. They arrived at the fire station at 7:06 p.m. When they arrived, Michael had no pulse and was not breathing. His pupils were fixed and dilated, and he was nonresponsive to pain. Firefighters began CPR on him and gave him oxygen through a mouth mask. They requested an ambulance be sent to the fire station to transport Michael to a hospital. When the firefighters cut off Michael's clothes to perform CPR, they noticed that he had some scars, as well as fresh wounds, around his pelvic area. The mother told George Brennan, the fire battalion chief, that Michael had received a spanking and been sent to his room. She said that when she and the appellant went to check on him, they found him limp. The appellant told Brennan that he had given Michael a "whooping" because he had wet his pants and stressed that it was a normal "whooping."

Approximately ten minutes after Michael arrived at the fire station, an ambulance arrived. The firefighters continued performing CPR on Michael while he was loaded into the ambulance and transported to the hospital. Michael Brake, a paramedic, worked on Michael on the way to the hospital. He detected no signs of life in Michael. He hooked him up to a heart monitor, but found no heart beat. He also listened for breath sounds and heart tones, but found none. Brake placed an endotracheal tube down Michael's throat and administered the drug epinephrine in an unsuccessful attempt to resuscitate him.

While working on Michael, Brake noticed some "straight line type scars" with "frayed marks that came off the straight line scar[s]" across his lower abdomen. He also observed a lot of bruising in various stages of healing on his lower abdomen. Brake noticed more of these same types of scars on Michael's back and buttocks and observed that the area from the top of his buttocks to the back of his knees was "black and blue."

Peter Aratakis, a police officer with the Kansas City Police Department, was dispatched to the fire station in regard to an "infant nonbreather." He followed the ambulance to the hospital. At the hospital, Officer Aratakis contacted the appellant, who told him that he had disciplined Michael in regard to potty training by "striking him on his bottom with a leather belt five or six times."

Upon reaching Children's Mercy Hospital at approximately 7:37 p.m., Michael was turned over to Dr. Teresa Murdock, a pediatric emergency medical doctor. At that time, Michael was not breathing on his own, had no heart rate, and his pupils were fixed and dilated. His eyes had a gelatinous appearance. After Dr. Murdock tried to resuscitate Michael with no success, she pronounced him dead at 7:49 p.m. Dr. Murdock observed that Michael had multiple injuries, new and old, to his chest, legs, buttocks, and arms. She noticed that he had multiple loop marks, new and old, in his groin area, on his stomach, trunk, and back. She also saw that the skin was ripped off areas of his legs and that there were "hypopigmented" areas on his back from old loop mark scars where his skin color probably would not have grown back.

While Dr. Murdock was working on Michael, Officer Aratakis talked with the mother and the appellant at the hospital. The appellant told him that he had disciplined Michael in regard to potty training at around 6:45 p.m. by striking him with a leather belt five times. He also said that he noticed that Michael was not breathing within a few minutes of striking him.

After pronouncing Michael dead, but before informing the appellant and the mother of that fact, Dr. Murdock spoke with them. The appellant told her that Michael had wet his pants and that he had whipped him with a thin leather belt and that he "couldn't believe he was dead from a whipping."

Sergeant Harold Headrick of the Kansas City, Missouri, Police Department arrived at the hospital at 8:03 p.m. After meeting with the mother and the appellant and observing Michael, he took the appellant to police headquarters at 9:45 p.m. for interrogation. At police headquarters, he read the appellant his *Miranda* rights. After waiving his rights, the appellant told Sergeant Headrick that he had spanked Michael after he wet his pants.

Gregory VanRyn, a crime scene technician with the Kansas City, Missouri, Police Department, was dispatched to the appellant's home sometime that evening to collect any relevant evidence. He collected the belt used by the appellant to strike Michael earlier that evening, a black leather braided belt that had become "unfurled" at one end.

Dr. Sam Gulino, a forensic pathologist, performed an autopsy on Michael on May 30, 1997. He found that most of the right side of Michael's abdomen extending down to the front of his right thigh had multiple linear injuries, "short straight line type of injuries," new and old. Most of these new injuries were bruises but some were abrasions where the skin had been scraped off. The older injuries were either abrasions or contusions. Dr. Gulino determined that these injuries were caused by some kind of blunt trauma. There were also some old linear scars and injuries on the upper right and middle portions of Michael's back. In addition, there was an area of discoloration caused by bruising in the central and right part of Michael's lower back that had been in the process of healing. Michael's left thigh, including the inner portion of the thigh, was bruised and had some faint abrasions. Dr. Gulino found two fresh linear bruises on the front part of Michael's upper right arm.

Dr. Gulino also found a "tremendous amount" of bruising, swelling, and abrasions that extended from the bottom portion of Michael's right buttock to his right calf, including his right thigh. In some areas, these injuries were linear, similar to those on the front part of his body but "in some areas [the injuries] had become so overlapped, they were just a big confluent area of abrasion." There were many more fresh injuries to his right thigh than old ones. Dr. Gulino also found areas of pallor in some of Michael's linear bruises. Pallor, which means that the central portion of a bruise is pale in color instead of purple, indicates that the bruise was caused by some kind of object that is long and narrow, like a baton or stick.

Michael's right thigh was larger in diameter than his left thigh and, upon making an incision into the back of his right thigh, Dr. Gulino found a large collection of blood and liquefied fat. According to Dr. Gulino, fat becomes liquefied when it is crushed by a tremendous amount of force. The pressure disrupts the fat cells, causing them to liquefy. Dr. Gulino also found that the skin of the right thigh had become torn away from the tissue beneath it and that there was bruising into the muscles of the thigh. In Michael's case, the liquefied fat cells from his right thigh entered his bloodstream and traveled into his lungs causing fat embolisms, which plugged the blood vessels in his lungs such that his body was unable to oxygenate blood. This caused the right side of his heart to go into failure. In addition, he bled internally into the soft tissue of his right thigh. Dr. Gulino determined that Michael died as a result of the fat embolisms in his lungs, heart failure, and blood loss in the soft tissue of his right thigh.

On June 23, 1997, an indictment was returned by a grand jury in the Circuit Court of Jackson County, Missouri, charging the appellant with murder in the

second degree, § 565.021.1(1), or, in the alternative, felony murder in the second degree, § 565.021.1(2), based on the underlying felony of endangering the welfare of a child, § 568.045; endangering the welfare of a child, § 568.045; and armed criminal action, § 571.015. On April 22, 1998, an amended information in lieu of an indictment was filed further charging the appellant as a prior offender, §§ 558.016, 558.019, and 557.036.4, RSMo Supp.1996.

In pretrial proceedings on June 8, 1998, the appellant filed a motion to dismiss the charge of felony murder in the second degree, § 565.021, claiming that the underlying felony of endangering the welfare of a child in the first degree merged into the felony murder charge such that it could not support a conviction for felony murder, which motion the trial court overruled. The case was tried to a jury that same day. At the conclusion of the State's evidence and all the evidence, the appellant made a motion for judgment of acquittal as to all charges against him, which was overruled.

The jury returned verdicts of guilty as to the charges of felony murder in the second degree, endangering the welfare of a child, and armed criminal action, but a verdict of not guilty as to the charge of conventional second degree murder. On July 6, 1998, the appellant filed a motion for judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial. The trial court overruled the motion on August 28, 1998. The appellant was then sentenced to consecutive terms of life, five years, and twenty-five years of imprisonment, respectively, in the Missouri Department of Corrections.

This appeal follows.

## I.

Initially, we note that the disposition of the claims raised by the appellant in Points I and III are contingent on the disposition of the claim he raises in Point V. This is so in that, if we agree with the appellant's claim in Point V, we would be required to reverse his conviction for felony murder, rendering his claims in Points I and III moot. The claim in Point I would be moot in that it attacks, as does the claim in Point V, his conviction for felony murder. The claim in Point III would be moot in that it attacks his conviction for ACA, based on the underlying felony of felony murder, which conviction could not stand if the felony murder conviction is overturned. *State v. Peters*, 855 S.W.2d 345, 347–48, 354–56 (Mo. *banc* 1993) (Robertson, C.J., dissenting); *State v. Weems*, 840 S.W.2d 222, 228 (Mo. *banc* 1992); *State v. Howard*, 896 S.W.2d 471, 491 (Mo.App.1995). Because Points I and III are contingent on our disposition of Point V, we logically address it first.

In Point V, the appellant claims that the trial court erred in overruling his pretrial motion to dismiss the felony murder charge against him based on the application of the merger doctrine. Generally speaking, the doctrine, a creature of judicial interpretation, is a "means of limiting or barring application of the felony-murder rule" when the act causing the homicide is indivisible from the act providing the basis for the underlying felony. *State v. Coody*, 867 S.W.2d 661, 664 n. 1 (Mo.App.1993).[2] In support of his claim that the doctrine applies here to bar his being charged with felony murder, the appellant contends that his alleged act of striking the victim with a belt, which formed the basis for the underlying felony of endangering the welfare of a child, was the same act that was alleged to have caused his death, which merged into the homicide.

The question of whether the trial court should have dismissed the felony murder charge against the respondent is a question of law. As such, it falls within this court's province of independent review and correction. *State v. Tinoco*, 967

2. The appellant does not attack his conviction on double jeopardy grounds.

S.W.2d 87, 89 (Mo.App.1998) (*citing Barry Serv. Agency Co. v. Manning*, 891 S.W.2d 882, 887 (Mo.App.1995)). "Or, in other words, as to questions of law, our review is *de novo* with no deference being paid to the trial court's determination of the law." *Id.*

■■■ The felony murder rule derives from common law and permits a homicide to be classified as murder, even though committed unintentionally, if it occurred during the pursuit of a felony. *State v. Clark*, 652 S.W.2d 123, 125–26 (Mo. *banc* 1983). "'The felony murder rule permits the felonious intent necessary to a murder conviction to be shown by the perpetration of or attempt to perpetrate a felony.'" *Id.* at 126 (citation omitted). As such, "*'[t]he rule does not make the underlying felony an element of the felony murder; it merely provides an additional means of proving the requisite felonious intent for murder.'*" *Id.* (citations omitted). "It is the intent to commit the underlying felony, not the intent to kill, that is the gravamen of the felony murder offense." *State v. Coleman*, 949 S.W.2d 137, 142 (Mo.App.1997).

> The purpose of the felony murder rule is to deter the commission of homicides during felonious activity by holding the felon liable for murder, even though the killing may have been committed only recklessly, negligently, or even entirely accidentally. Homicides are thus prevented by requiring that the felon commit a felony in a careful manner or risk murder liability for any deaths that result. The felony murder rule, therefore, dispenses with the usual rule of determining the *mens rea*, or state of mind, of the person causing the homicide and allocating the punishment for the unlawful killing accordingly. In other words, a person is strictly liable for murder if he causes any deaths during his commission of a felony.

Russell R. Barton, *Application of the Merger Doctrine to the Felony Murder Rule in Texas: The Merger Muddle*, 42 BAYLOR L.REV. 535, 536 (1990) (footnotes omitted).

Prior to October 1, 1984, Missouri statutes provided for two degrees of felony murder. Section 565.003, RSMo 1978, governing murder in the first degree, provided that a killing committed in "'the perpetration of or in the attempt to perpetrate arson, rape, robbery, burglary, or kidnapping' was first degree murder." *State v. Hall*, 956 S.W.2d 427, 429 (Mo. App.1997) (*quoting* § 565.003, RSMo 1978). Section 565.004, RSMo 1978, governing murder in the second degree, provided that "[a]ll other kinds of murder at common law, not. herein declared to be manslaughter or justifiable or excusable homicide, shall be deemed murder in the second degree." The language "[a]ll other kinds of murder at common law" in § 565.004, RSMo 1978, was interpreted to mean "(1) [i]ntentional murder, nondeliberate, and (2) homicides committed in the perpetration of or attempt to perpetrate *any* felony other than the five listed in the first degree murder statute." *Clark*, 652 S.W.2d at 127 (*citing* MAI–CR 2d 15.16, Notes on Use 3 (Apr. 12, 1978)); *State v. O'Dell*, 684 S.W.2d 453, 460 (Mo.App.1984).

■ In 1983, as part of its revision of the homicide statutes, the legislature repealed §§ 565.003 and 565.004, RSMo 1978, and enacted in lieu thereof § 565.020, dealing with first degree murder, and § 565.021, dealing with second degree murder, both effective October 1, 1984. *Hall*, 956 S.W.2d at 429. No provision was made in § 565.020 for felony murder being classified as first degree murder. Rather, felony murder was relegated strictly to being classified as second degree murder, under § 565.021. *Hall*, 956 S.W.2d at 429. Section 565.021 provides, in pertinent part:

> 1. A person commits the crime of murder in the second degree if he:
>
> (1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; or

(2) Commits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

2. Murder in the second degree is a class A felony, and the punishment for second degree murder shall be in addition to the punishment for commission of a related felony or attempted felony, other than murder or manslaughter.

Thus, to prove conventional second degree murder under § 565.021.1(1), the State must show that the defendant " '[k]nowingly cause[d] the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person.' " *State v. Smith,* 966 S.W.2d 1, 4–5 (Mo.App.1997) (*quoting* § 565.021.1(1)). However, to prove second degree felony murder under § 565.021.1(2), the state is not required to show such an intent, but only that a person was killed in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration of such felony. In other words, under § 565.021.1(2), the "underlying felony supplies the requisite *mens rea* for second-degree felony murder." *State v. Pembleton,* 978 S.W.2d 352, 356 (Mo.App.1998).

■ As stated, *supra,* the appellant sought, by his motion to dismiss, to bar his prosecution for felony murder under the merger doctrine. Our research discloses that the doctrine was first recognized in this state by the Missouri Supreme Court in *State v. Shock,* 68 Mo. 552 (1878), *overruled on other grounds by State v. Hopkirk,* 84 Mo. 278, 287–88 (1884), in which it

held, in interpreting the "other felony" language of the felony murder statute then in effect,[3] that it did not include "those acts of personal violence to the deceased which are necessary and constituent elements of the homicide itself, and are, therefore, *merged* in it." *Id.* at 561 (emphasis added). Since *Shock,* there have been very few cases dealing with the doctrine. The doctrine was discussed and applied by the Eastern and Western Districts of the Missouri Court of Appeals in *State v. Rogers,* 976 S.W.2d 529 (Mo.App.1998); *State v. Hanes,* 729 S.W.2d 612 (Mo.App.1987); and *State v. Cook,* 560 S.W.2d 299 (Mo.App.1977). It was also discussed by the Southern District in *State v. DeJournett,* 868 S.W.2d 527, 533–34 (Mo.App.1993), citing *Cook;* however, the court questioned the continuing viability of the doctrine but, in any event, held that the facts of the case at bar did not support its application. *Id.*

In *Cook,* the defendant was judge-convicted of second degree murder, without any finding as to whether it was conventional or felony second degree murder. *Cook,* 560 S.W.2d at 300–01. The homicide resulted from a car chase in which obscenities were exchanged between the occupants of the two vehicles, causing a passenger in one of the vehicles to shoot and kill a passenger in the other vehicle. *Id.* at 301–02. On appeal, the defendant raised various issues, some requiring an assumption that he was convicted of conventional second degree murder, while others requiring an assumption that he was convicted of second degree felony murder. *Id.* at 303. In attacking what he assumed, for purposes of his claim, was his conviction for felony murder, the defendant relied on the finding of the trial court that he intentionally shot the victim " 'while in the act of exhibiting a deadly and dangerous weapon in a rude, angry and threatening manner,' " a felony under § 564.610, RSMo

---

**3.** Mo.Rev.Stat. ch. 47, Crimes and Punishments, art. II, § 1 (1845), read:

Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and

premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed murder in the first degree.

1969. *Id.* In addressing the various issues raised on appeal, the court found that the defendant was convicted of conventional second degree murder because he could not have been convicted for felony murder in that the facts did not support such a conviction. In so finding, the court stated:

> An even more compelling reason exists to conclude that the trial judge found defendant guilty of conventional second degree murder and not second degree felony murder. The salient facts disclose that no appreciable amount of time elapsed between the time defendant stuck the revolver out the window of the car and the shooting of the victim. This being the case, defendant's display of the revolver in a "rude, angry and threatening manner" was such an integral part of the consummated homicide that it lost its separate identity. Contrary to defendant's contention, it did not constitute a separate underlying felony proscribed by Section 564.610, supra, but was part and parcel of the homicide itself. . . . Exhibiting the revolver in a rude, angry and threatening manner in the presence of the victim in the instant case was of such a fleeting nature that it was a distinct part of and inseparably related to the overall physical act required to perpetrate the homicide. Common sense dictates that flourishing the weapon in the manner heretofore mentioned and killing the victim constituted a single indivisible transaction. Such being the case, no distinct or separate underlying felony existed upon which to predicate application of the second degree felony murder rule. To hold otherwise would give the felony murder rule a diabolic twist, extend its application beyond all [r]ational bounds, and pervert the very purpose which it was legally designed to serve.

*Id.* at 303–04.

In *Hanes,* the defendant was convicted of capital murder, under § 565.001, RSMo 1978. *Hanes,* 729 S.W.2d at 614. The defendant killed the victim by jumping on his chest, shoving a knee into his stomach, fracturing four of his left ribs, and then injecting a toxic substance into his arm. *Id.* at 615. On appeal, he claimed that the trial court erred in failing to instruct the jury on second degree felony murder, arguing that the evidence supported such a submission in that it demonstrated that he had committed the underlying felony of assault in the first or second degree. *Id.* at 616. The court, in holding that the evidence did not support a submission for second degree felony murder, stated:

> If the assault resulted in death, the assault itself was includable in the charge of homicide. The felony-murder doctrine does not apply where the felony is an offense included in the charge of homicide. The acts of assault merge into the resultant homicide, and may not be deemed a separate and independent offense which could support an instruction for felony murder.

*Id.* at 617.

In *Rogers,* the defendant was convicted of second degree felony murder. *Rogers,* 976 S.W.2d at 530. The underlying felony alleged to support his conviction was the unlawful use of a weapon, under § 571.030.1(4), by exhibiting a handgun in an angry or threatening manner. *Id.* at 531. As to the underlying felony, the State introduced evidence to show that, after exchanging words with his estranged wife, who at the time was socializing with a crowd of people in a parking lot outside a local bar, the defendant fired a 9–mm handgun into the air, in an attempt to scare the crowd. *Id.* at 530–31. Thereafter, he pointed the gun to the ground, at which time, his wife told him that he "didn't have the balls to shoot that gun." *Id.* at 531. He then pointed the gun at the victim, lowered it, and fired a second shot into the street. *Id.* The bullet ricocheted off the street and struck the victim in the shoulder area and then through her lung. *Id.* The resultant bleeding eventually led to her death. *Id.*

On appeal to this court, the defendant in *Rogers*, citing *Cook* and *Hanes*, claimed that the underlying felony merged with the homicide and would not support a felony murder conviction. *Id.* at 531–32. While expressly recognizing the merger doctrine as barring a prosecution for felony murder where the act constituting the underlying felony was included in the homicide, the court held it did not apply to bar the defendant's prosecution and conviction for felony murder, stating:

> In the present case, the underlying felony is exhibiting a weapon in an angry or threatening manner, rather than a violent offense such as assault. Defendant's first shot in the air was alone sufficient to constitute commission of the underlying felony. Defendant testified that the first shot was intended to scare the entire crowd of people, not just [the victim]. Only the second shot, where the defendant pointed the gun at the victim and then fired it into the street, could be considered to have merged into the killing of [the victim]. In other words, had there been no separate and distinct act of firing the gun in the air, but only the second act of pointing the gun at [the victim] and then shooting into the street, it would have been difficult to have sustained a charge of felony murder.... [T]he initial firing of the gun becomes a separate divisible act.... Since the first shot was independent of the second shot, it ... could not merge into the killing.

*Id.* at 532.

In hindsight, while we do not quarrel with the *Rogers* court's finding that the first shot was a separate divisible act, supporting the underlying felony, which did not merge into the homicide, we do take issue with the court's holding that it supported a conviction for felony murder. This is so in that, given the court's determination that the underlying felony relied upon for conviction of felony murder was complete when the first shot was fired, no death resulted in the perpetration thereof or flight therefrom, as required by § 565.021.1(2), to convict for felony murder. Hence, although we read *Rogers* as recognizing the merger doctrine, we believe its holding in affirming the defendant's conviction was in error, unless, assuming that the doctrine is still viable, which we discuss, *infra*, it could be found that the second shot did not merge into the homicide and would support a conviction for felony murder, which issue the court addressed, but did not expressly decide.

■ We would note that the Missouri cases cited, *supra*, did not go into great detail as to the reasons for the merger doctrine or in delineating its parameters. However, cases in the numerous other jurisdictions that have recognized the doctrine, sometimes referred to as the collateral-felony doctrine, have done so. *See State v. Lucas*, 243 Kan. 462, 759 P.2d 90 (1988); *Commonwealth v. Gunter*, 427 Mass. 259, 692 N.E.2d 515 (1998); *State v. Branch*, 244 Or. 97, 415 P.2d 766 (1966); *People v. Hansen*, 9 Cal.4th 300, 36 Cal. Rptr.2d 609, 885 P.2d 1022 (1994). The advent of the doctrine in the various jurisdictions cited appears to stem from the recognition by their courts of certain propositions. First is the recognition that the felony murder rule serves to relieve prosecutors of the burden of establishing the requisite intent for murder and that its purpose is to deter negligent or accidental killings that may occur in the course of committing a felony. As stated in *Lucas*, " '[t]he purpose of the [felony murder] statute is to deter those engaged in felonies from killing negligently or accidentally[,] and that doctrine should not be extended beyond its rational function which it was designed to serve.' " *Lucas*, 759 P.2d at 93 (*quoting State v. Lashley*, 233 Kan. 620, 664 P.2d 1358, 1369 (1983)). Second is the recognition of the fact that, as a practical matter, the vast majority of homicides have their genesis in some type of felonious assault. *Hansen*, 36 Cal. Rptr.2d 609, 885 P.2d at 1028; *State v. Campos*, 122 N.M. 148, 921 P.2d 1266, 1270

(1996). Given these propositions, various reasons have been given for the doctrine: (1) the application of the felony murder rule would work to eliminate the *mens rea* requirement for most homicide cases and circumvent the legislative gradation system for classes of homicides, including manslaughter. *Lucas,* 759 P.2d at 94; *Gunter,* 692 N.E.2d at 525; *Branch,* 415 P.2d at 767; *Hansen,* 36 Cal.Rptr.2d 609, 885 P.2d at 1028. "If a felonious assault could ... be used as the predicate felony for felony murder, every felonious assault resulting in death would be murder, and any lesser offense such as voluntary manslaughter, involuntary manslaughter, and criminally negligent homicide would effectively be eliminated." Barton, *Application of the Merger Doctrine to the Felony Murder Rule in Texas: The Merger Muddle, supra,* at 538 (footnotes omitted). "The result would be that the prosecution would not have to prove that the defendant had a specific intent to kill in most murder cases," *id.;* and (2) "[t]he rationale of the merger doctrine is consistent with the purpose of the felony murder rule." *Id.* "Because a homicide is usually the result of an assault, and because a felonious assault involves a risk of death, a felon would not be deterred from committing a dangerous and homicidal act for the reason that the felony itself is the homicidal act sought to be deterred." *Id.* at 539.

As to the basis for the merger doctrine, the *Shock* court interpreted the felony murder statute implicated as requiring, for the predicate felony, a collateral felony that was separate and distinct from the homicide itself in order to prevent the effective elimination of the statutory gradation system for homicides, which required proof of various intents with respect to the act causing the death of the victim. *Shock,* 68 Mo. at 561–63. In *Cook,* the basis given by the court for the doctrine was that it was necessary to prevent the felony murder rule from being given "a diabolic twist," so as to "extend its application beyond all [r]ational bounds, and pervert the very purpose which it was legally

designed to serve." *Cook,* 560 S.W.2d at 304. As to *Hanes* and *Rogers,* there was no discussion as to the impetus for the doctrine. In any event, we are of the opinion that the need for the doctrine is legally well grounded, for the reason stated in *Shock* and for the reasons discussed, *supra,* with respect to the other jurisdictions that recognize the doctrine. *Lucas,* 759 P.2d at 94; *Gunter,* 692 N.E.2d at 525; *Branch,* 415 P.2d at 767; *Hansen,* 36 Cal. Rptr.2d 609, 885 P.2d at 1028.

■ With respect to the actual statement of the doctrine, we note that different terms were used in *Shock, Cook, Hanes,* and *Rogers.* In *Shock,* the test for applying the doctrine was characterized by the supreme court in terms of whether the predicate felony was "collateral" to the homicide in that the "*acts* of personal violence to the deceased ... [were] necessary and constituent elements of the homicide itself." *Shock,* 68 Mo. at 561 (emphasis added). In *Cook,* the test was stated as whether there was a "distinct or separate underlying felony" which was not an "integral part" of the homicide. *Cook,* 560 S.W.2d at 303–04. While, in *Hanes,* the test was stated as whether the underlying felony was "independent" of the homicide. *Hanes,* 729 S.W.2d at 617. In *Rogers,* the test was phrased as whether the act supporting the underlying felony was a "separate and distinct act" from the homicide. *Rogers,* 976 S.W.2d at 532. Although stated various ways, we believe that all share the common theme that the doctrine provides that the felony murder rule will not apply where the lethal act serves as the basis for the predicate felony.

■ Logically, before we turn to the issue of whether the merger doctrine, as stated, applies in this case to bar the appellant's prosecution and conviction for felony murder, we must first address the State's contention that the doctrine is no longer viable in this state. In this regard, the State contends that, even assuming that the doctrine was at some point viable

in this state, it is no longer due to the express language of § 565.021.1(2), which was effective October 1, 1984, providing that "any felony" will serve as a predicate felony for purposes of felony murder. Specifically, the State contends that by the use of the phrase "any felony" in the statute, the legislature intended that even those felonies included in the homicide itself could serve as the underlying felony for a felony murder charge. It goes without saying that, unless constitutionally infirm, the courts are obligated to follow and apply the law as written by the legislature. *State v. Burns*, 978 S.W.2d 759, 761 (Mo. banc 1998); *State v. Haskins*, 950 S.W.2d 613, 615 (Mo.App.1997). As such, as the State contends, the merger doctrine cannot stand if our felony murder statute precludes the same. Thus, we are necessarily required to interpret it.

In interpreting statutes, our purpose is to ascertain the intent of the legislature. *State v. Plastec, Inc.*, 980 S.W.2d 152, 155 (Mo.App.1998). In doing so, we look to the language used, giving it its plain and ordinary meaning. *State v. Lanier*, 985 S.W.2d 377, 379 (Mo.App. 1999). When a word used in a statute is not defined therein, it is appropriate to derive its plain and ordinary meaning from a dictionary. *State v. Silvey*, 980 S.W.2d 103, 108 (Mo.App.1998); *State v. Crews*, 968 S.W.2d 763, 765 (Mo.App.1998). The courts are without authority to read into a statute a legislative intent which is contrary to the intent made evident by giving the language employed in the statute its plain and ordinary meaning. *State v. Smith*, 972 S.W.2d 476, 479 (Mo.App.1998). When the legislative intent cannot be ascertained from the language of the statute, by giving it its plain and ordinary meaning, the statute is considered ambiguous and only then can the rules of statutory construction be applied. *Haskins*, 950 S.W.2d at 616.

Giving the "any felony" language of the statute its plain and ordinary meaning, we interpret it to mean "every" felony.

The term "any" is defined by WEBSTER'S NEW WORLD COLLEGE DICTIONARY 62 (3rd ed.1997) as "1 one, no matter which, of more than two … 3 without limit … 5 every…." This court does not recognize ambiguity in the word "any." Just as "[t]he word 'any' as used in a constitutional provision is 'all-comprehensive[,] and [is] equivalent to "every,"'" it should also be construed as "all-comprehensive" in a statutory provision. *Boone County Court v. State*, 631 S.W.2d 321, 325 (Mo. banc 1982) (*quoting State ex rel. Randolph County v. Walden*, 357 Mo. 167, 206 S.W.2d 979, 983 (Mo. banc 1947)). As such, this language reflects a legislative intent to include, without limitation, in the class of felonies supporting a charge of felony murder, every felony, which, in our view, would, in effect, eliminate the merger doctrine. However, this appears to fly in the face of the holdings in *Shock, Cook, Hanes,* and *Rogers* in that we interpret the felony murder statutes in effect at the times these cases were decided as extending felony murder to "any felony," for the reasons discussed, *infra,* as does the present statute, yet they all recognized the merger doctrine as a limitation on the felony murder rule.

As discussed, *supra,* in *Shock,* the Missouri Supreme Court was called upon to interpret the language of the felony murder statute then in effect. In this respect, MO.REV.STAT. ch. 47, Crimes and Punishments, art. II, § 1 (1845), read:

> Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of wilful, deliberate, and premeditated killing, or which shall be committed in the perpetration, or attempt to perpetrate any arson, rape, robbery, burglary, or *other felony,* shall be deemed murder in the first degree.

(Emphasis added.) Other than the limitation of the merger doctrine, enunciated by the court, the statute obviously extended felony murder to "any felony," in that the

language did not expressly exclude any.[4] Thus, in this respect, we discern no difference between the statute interpreted by the *Shock* court and § 565.021.1(2).

As to the felony murder statutes addressed in *Cook* and *Hanes*, as discussed, *supra*, which was prior to the effective date of § 565.021.1(2), felony murder was classified as both first degree and second degree murder, depending on the predicate felony charged. As to first degree felony murder, § 565.003, RSMo 1978, expressly required a predicate felony of arson, rape, robbery, burglary, or kidnapping, whereas second degree felony murder, under § 565.004, RSMo 1978, was interpreted as providing for "any" or "every" other felony as a predicate felony for felony murder. *Clark*, 652 S.W.2d at 127; *O'Dell*, 684 S.W.2d at 460–61. As such, prior to October 1, 1984, the law provided, in effect, that "any" felony would be sufficient to charge felony murder, either first or second degree. Given the foregoing, when the legislature enacted § 565.021.1(2), classifying felony murder as second degree murder only and providing that "any" felony was sufficient on which to base a felony murder charge, it simply was continuing what was the law as decided in *Shock, Cook,* and *Hanes* as to the requisite felonies to support felony murder.[5] In light of this fact, the State's argument that the merger doctrine was abrogated by the enactment of § 565.021.1(2) and its language providing for "any felony" as to the predicate felonies to support felony murder not only flies in the face of the *Rogers* decision, decided after the effective date of the statute, but the other decisions cited, which clearly recognized the doctrine under what was, in effect, the same law, with respect to this issue.

■ It would appear that the decisions in question upheld the doctrine despite the various versions of the felony murder statute being interpreted as applying to "any felony."[6] We can only assume that the courts involved did not see the application of the doctrine as a case of statutory interpretation, but one of whether the doctrine was necessary to limit the felony murder rule to its commonly defined purposes, as discussed, *supra*. In any event, regardless of the effect of the "any felony" language of § 565.021.1(2) on the continuing viability

---

4. In apparent recognition of this fact, the General Assembly in 1879 deleted the reference to other felonies and for it substituted the specific felony of "mayhem." *State v. Glover*, 330 Mo. 709, 50 S.W.2d 1049, 1051 (1932).

5. The State cites *State v. Hall*, 956 S.W.2d 427, 429 (Mo.App.1997), in support of the proposition that the Eastern District of this court had recognized that felony murder was greatly expanded in 1984 by the enactment of § 565.021.1(2) to provide that "any felony" was sufficient to support felony murder. However, even a cursory reading of this decision discloses that the court's finding in this regard was based on the premise that prior to 1984 felony murder was limited to the five enumerated felonies in § 565.003, RSMo 1978, governing *first degree felony murder*, while totally ignoring § 565.004, RSMo 1978, governing *second degree felony murder*, which encompassed all other felonies. This fact is readily apparent from the following language from the court's decision:

In 1983, effective October 1, 1984, the General Assembly adopted revised homicide statutes. Section 565.003 RSMo 1978 was repealed and section 565.021.1(2) became the new felony murder statute. That statute provides that if a person "commits or attempts to commit *any* felony, and, in the perpetration or the attempted perpetration of such felony ... another person is killed ...," the killer commits the crime of second degree murder. Section 565.021.1(2) (emphasis added).

As can be readily seen, the breadth of felony murder greatly expanded in 1984. *Previously it had been limited to five enumerated felonies*. The new statute applied felony murder to "any felony."

*Id.* at 429 (emphasis added). Thus, we find no support for the State's position in *Hall*.

6. We would note that in *State v. Lucas*, the Supreme Court of Kansas continued to recognize the doctrine even though Kansas's felony murder statute contained the same "any felony" language raised by the State here as abrogating the doctrine. *Lucas*, 759 P.2d at 93.

of the doctrine, the State points to other language in the statute, which did not exist previously, either expressly or in effect, that leads it to conclude that the legislature intended to extend the felony murder rule to every felony, except as limited by § 565.021.2, which provides: "Murder in the second degree is a class A felony, and the punishment for second degree murder shall be in addition to the punishment for commission of a related felony or attempted felony, *other than murder or manslaughter.*" § 565.021.2 (emphasis added). Giving this language its plain and ordinary meaning, we would agree with the State that the legislature intended that the felony murder rule would not extend to the felonies of murder and manslaughter. This then would be in keeping with one of the primary purposes of the merger doctrine, as discussed, *supra,* preventing the felony murder rule from swallowing up the offense of manslaughter and destroying the statutory gradation system for homicides. The question remains, however, whether the legislature intended, in excluding murder and manslaughter from the felony murder rule, to otherwise limit the predicate felonies which would support felony murder. The State says not, citing *Rodriguez v. State,* 953 S.W.2d 342 (Tex. Ct.App.–Austin 1997). We agree.

■ The *Rodriguez* court was called upon to determine the continuing viability of the merger doctrine in Texas given the language of the felony murder statute then in effect, TEX. PENAL CODE ANN. § 19.02(b)(3) (West 1994). Section 19.02(b) provided, in pertinent part, that "[a] person commits an offense if he: ... (3) commits or attempts to commit a felony, *other than manslaughter.*" (Emphasis added). In concluding that the merger doctrine in Texas would not apply to limit the application of the felony murder rule, given the language of the statute, the court stated:

> If [the legislature] had intended to exempt other felony offenses or lesser included felony offenses or to embrace the merger doctrine as a limitation on felony murder, it could easily have done so. The maxim *expresio unius est exclusio alterius* is often employed in the construction of statutes. In general, it means that a statute's inclusion of a specific limitation excludes all other limitations of that type. As applied to the instant case, it means that inclusion of the limitation as to manslaughter excludes all other limitations.
>
> Our legislature within its constitutional role remains free to abolish felony murder or limit its application or effect to other felonies. It is not the role of courts to abolish or judicially limit or expand a constitutionally valid statutory offense clearly defined by the legislature.

*Rodriguez,* 953 S.W.2d at 354 (citations omitted). Applying the same statutory construction as the *Rodriguez* court, which has been recognized by our courts, *City of Springfield ex rel. Board of Pub. Utils. v. Brechbuhler,* 895 S.W.2d 583, 585 (Mo. banc 1995); *State ex rel. Birk v. City of Jackson,* 907 S.W.2d 181, 185 (Mo.App. 1995), to our felony murder statute, we reach the same result, that our legislature excluded murder and manslaughter as predicate felonies for felony murder and, in doing so, intended that no other limitations be placed on the offense of felony murder, which would include limitation by way of the merger doctrine. Thus, regardless of our appellate courts' stated beliefs as to the merits of the doctrine in insuring that the felony murder rule is not extended beyond its logical bounds, the courts are obligated to enforce the felony murder statute as written, without limiting its application by the doctrine. Hence, the trial court did not err in failing to sustain the appellant's motion to dismiss the felony murder charge against him on the basis of the merger doctrine.

Point denied.

Having determined Point V against the appellant, we now turn to his claim in Point I.

## II.

In Point I, the appellant claims that the trial court erred in overruling his motions for judgment of acquittal at the close of the State's evidence and all the evidence because there was insufficient evidence to support his conviction of felony murder in that the State's medical evidence did not establish that his striking of his son with a belt, the act alleged as constituting the underlying felony of endangering the welfare of a child, caused his death. We disagree.

"When reviewing the sufficiency of [the] evidence supporting a criminal conviction, the [c]ourt does not act as a ' "super juror" with veto powers,' but gives great deference to the trier of fact." *State v. Chaney*, 967 S.W.2d 47, 52 (Mo.*banc*) (citation omitted), *cert. denied*, 525 U.S. 1021, 119 S.Ct. 551, 142 L.Ed.2d 458 (1998); *State v. Ellison*, 980 S.W.2d 97, 98 (Mo.App.1998). Appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror could find the defendant guilty beyond a reasonable doubt. *Ellison*, 980 S.W.2d at 98; *State v. Brown*, 996 S.W.2d 719, 728 (Mo.App.1999). In our review, all evidence favorable to the State and all reasonable inferences drawn therefrom are accepted as true, and all evidence and inferences to the contrary are disregarded. *State v. Ervin*, 979 S.W.2d 149, 159 (Mo. banc 1998), *cert. denied*, 525 U.S. 1169, 119 S.Ct. 1090, 143 L.Ed.2d 91 (1999); *State v. Knese*, 985 S.W.2d 759, 769 (Mo.*banc*), *cert. denied*, 526 U.S. 1136, 119 S.Ct. 1814, 143 L.Ed.2d 1017 (1999).

To convict a defendant of a criminal offense, the State is required, as a matter of due process, to prove beyond a reasonable doubt each and every element of the charged offense. *State v. Scurlock*, 998 S.W.2d 578, 582 (Mo.App.1999) (*citing State v. Roberts*, 948 S.W.2d 577, 590 (Mo. banc 1997)); *State v. Price*, 980 S.W.2d 143, 144 (Mo.App.1998). The appellant challenges his conviction for felony murder in the second degree under § 565.021.1(2).

As discussed, *supra*, § 565.021, which governs felony murder, provides, in pertinent part:

1. A person commits the crime of murder in the second degree if he:

. . .

(2) Commits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

The appellant challenges the sufficiency of the evidence to establish that his son was killed as a result of his perpetration of the underlying felony of endangering the welfare of a child in the first degree, § 568.045. Specifically, he claims that the State failed to prove beyond a reasonable doubt that his son's death occurred as a result of his striking of him with a belt.

At trial, James Stewart, the victim's half-brother, testified that on May 29, 1997, he heard the appellant striking Michael with a belt for fifteen to twenty minutes and heard him screaming and crying. Sergeant Headrick testified that the appellant, after waiving his *Miranda* rights, told him that he had spanked Michael after he wet his pants. Officer Aratakis testified that the appellant told him that he had disciplined Michael in regard to potty training by "striking him on his bottom with a leather belt five or six times."

Michael Brake, a paramedic who worked on Michael while he was being transported by ambulance to Children's Mercy Hospital, testified that he noticed some "straight line type scars" with "frayed marks that came off the straight line scar[s]" across his lower abdomen. He also observed a lot of bruising in various stages of healing on his lower abdomen. Mr. Brake noticed more of these same types of scars on

Michael's back and buttocks and observed that the area from the top of his buttocks to the back of his knees was "black and blue."

Dr. Sam Gulino, a forensic pathologist, performed an autopsy on Michael on May 30, 1997. At trial, he testified that he found that most of the right side of Michael's abdomen extending down to the front of his right thigh had multiple linear injuries, "short straight line type of injuries," new and old. Most of these new injuries were bruises, but some were abrasions where the skin had been scraped off. The older injuries were either abrasions or contusions. Dr. Gulino determined that these injuries were caused by some kind of blunt trauma, which he testified is "the type of trauma that is caused whenever a blunt object strikes the skin or when the skin is pushed into a blunt surface." There were also some old linear scars and injuries on the upper right and middle portions of Michael's back. Michael's left thigh, including the inner portion of the thigh, was bruised and had some faint abrasions.

Dr. Gulino also found a "tremendous amount" of bruising, swelling, and abrasions that extended from the bottom portion of Michael's right buttock to his right calf, including his right thigh. He testified that in some areas, these injuries were linear, similar to those on the front part of his body, but "in some areas [the injuries] had become so overlapped, they were just a big confluent area of abrasion." There were many more fresh injuries to his right thigh than old ones. Dr. Gulino testified that he found areas of pallor in some of Michael's linear bruises. He testified that pallor, which means that the central portion of a bruise is pale in color instead of purple, indicates that the bruise was caused by some kind of object that is long and narrow, like a baton or stick.

According to Dr. Gulino, Michael's right thigh was larger in diameter than his left thigh and, upon making an incision into the back of his right thigh, Dr. Gulino found a large collection of blood and liquefied fat. According to Dr. Gulino, fat becomes liquefied when it is crushed by a tremendous amount of force, and the pressure disrupts the fat cells, causing them to liquefy. Dr. Gulino also found that the skin of Michael's right thigh had become torn away from the tissue beneath it and that there was bruising into the muscles of the thigh. Dr. Gulino testified that, in Michael's case, the liquefied fat cells from his right thigh entered his bloodstream and traveled into his lungs causing fat embolisms, which plugged the blood vessels in his lungs such that his body was unable to oxygenate blood. This caused the right side of his heart to go into failure. In addition, he bled internally into the soft tissue of his right thigh. Dr. Gulino determined that Michael died as a result of the fat embolisms in his lungs, heart failure, and blood loss in the soft tissue of his right thigh.

Dr. Gulino testified that the belt the appellant used to strike Michael on the day he died was consistent with the injuries he saw on Michael during the autopsy. He testified that he suspected that belts like the one used to strike Michael could cause deaths, but that five or six blows from the belt, because it was unwove at one end, would not have caused Michael's injuries; it would take a "tremendous number of blows" by the belt to cause his injuries.

Dr. Teresa Murdock, the pediatric emergency medical doctor who examined Michael when he was brought to Children's Mercy Hospital on May 29, 1997, testified at trial that Michael had multiple injuries, new and old, to his chest, legs, buttocks, and arms. She noticed that he had multiple loop marks, new and old, in his groin area, on his stomach, trunk, and back. She also saw that the skin was ripped off areas of his legs. She testified that "loop mark" injuries are pathognomonic of child abuse and that "little thin objects like belts or little whips or electrical cords" cause loop marks when they are struck against a person. Dr. Murdock testified that the appellant told her that he had disciplined

Michael in regard to potty training by striking him with a leather belt five times. She testified that the belt used by the appellant to strike Michael on the day he died could have caused his injuries but that five or six blows from the belt would not have caused them. Instead, it would take "multiple, multiple whippings with this belt" to cause his injuries.

Viewing the above evidence in the light most favorable to the verdict and accepting as true all reasonable inferences from it, *Ervin*, 979 S.W.2d at 159; *Knese*, 985 S.W.2d at 769, we find that a reasonable juror could infer from this evidence that Michael's death occurred as a result of the appellant's striking of him with a belt and, as such, the trial court did not err in overruling his motions for judgment of acquittal because there was insufficient evidence to support his conviction of felony murder.

Point denied.

### III.

In Point II, the appellant claims that the trial court erred in overruling his *Batson* challenge to the State's use of a peremptory strike to strike a member of the venire on the basis that he was divorced because it deprived him of his constitutional right to be tried by a jury selected in a non-discriminatory manner in that the State failed to articulate constitutionally neutral reasons for its striking of this venireman. We disagree.

We will not reverse a trial court's determination regarding a *Batson* challenge unless it is clearly erroneous. *State v. Brown*, 998 S.W.2d 531, 541 (Mo. banc ), *cert. denied,*—— U.S. ——, 120 S.Ct. 431, 145 L.Ed.2d 337 (1999). " 'A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." ' " *State v. Jackson*, 969 S.W.2d 773, 775 (Mo. App.1998) (*quoting State v. Hall*, 955

S.W.2d 198, 205 (Mo. *banc* 1997) (citation omitted)). "A trial court's findings as to a *Batson* challenge are 'entitled to great deference because its decision depends largely on the evaluation of intangibles such as credibility and demeanor.' " *Id.* (*quoting State v. Roddy*, 963 S.W.2d 313, 317 (Mo. App.1997)).

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court prohibited the use of peremptory strikes to exclude potential jurors based on race, and in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), *Batson* was extended to prohibit peremptory strikes on the basis of gender. *Brown*, 998 S.W.2d at 541; *State v. Deck*, 994 S.W.2d 527, 536 (Mo.banc ), *cert. denied,*—— U.S. ——, 120 S.Ct. 508, 145 L.Ed.2d 393 (1999). In Missouri, the supreme court has set out a three-part test for a trial court to follow when confronted with a *Batson* challenge. *State v. Wright*, 972 S.W.2d 305, 307 (Mo.App.1998); *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992).

> First, the defendant must raise a *Batson* challenge with regard to one or more specific venirepersons struck by the state and identify the cognizable racial group to which the venireperson or persons belong. The trial court will then require the state to come forward with reasonably specific and clear race-neutral explanations for the strike. Assuming the prosecutor is able to articulate an acceptable reason for the strike, the defendant will then need to show that the state's proffered reasons for the strikes were merely pretextual and that the strikes were racially motivated.

*Parker*, 836 S.W.2d at 939 (citations omitted).

The State's explanation for the strike only has to be facially race-neutral. Unless a discriminatory intent is inherent in the explanation, the court will deem the explanation race-neutral, even if it is not persuasive or even plausible. If the

prosecutor states a race-neutral reason for the strike, the burden shifts back to the defendant to show that the State's explanation was merely pretextual and that the strikes were, in fact, racially motivated. If the defendant fails to challenge the State's explanation of the peremptory strike as a pretext, and simply relies on general or conclusory allegations about the State's reasoning, no effective *Batson* challenge has been made, and nothing is preserved for appeal.

*Wright,* 972 S.W.2d at 307 (citations omitted).

■ After the appellant's *Batson* objection, the State offered several explanations for its strike, including the fact that the prospective juror was divorced, and the prosecutor did not want any divorced people serving on the jury in a child homicide case. The trial court determined that the State's proffered reasons for striking him were not racially motivated or pretextual. The court then asked the appellant's counsel if he had anything to add, to which he responded, "Nothing to add, your Honor."

The appellant now challenges on appeal the State's strike because the venireman was divorced, claiming that striking a prospective juror because of his divorced status "denied [the appellant] the constitutional right to be tried by a cross representation of the community." The appellant did not raise this claim before the trial court. After the State offered a race-neutral reason for its strike, the burden shifted back to the appellant to show that the State's explanation was merely pretextual and that the strike was, in fact, racially motivated. However, the appellant failed to challenge the State's explanation of the peremptory strike as a pretext, telling the trial court that he had "nothing to add." As such, the appellant did not make an effective *Batson* challenge to the State's strike and has not preserved this issue for appeal. *Wright,* 972 S.W.2d at 307.

■ Even assuming, *arguendo,* that the appellant had preserved this issue for appeal, a successful *Batson* challenge requires that the defendant initially "object to the state's peremptory strike and identify the protected class to which the prospective juror belongs." *Deck,* 994 S.W.2d at 537. The appellant has cited no authority nor do we find any compelling reason to extend the tenets of *Batson* to prohibit peremptory strikes of prospective jurors on the basis of their marital status. *State v. Whitfield,* 947 S.W.2d 537, 539 (Mo.App. 1997); *State v. Strauss,* 779 S.W.2d 591, 595 (Mo.App.1989).

Point denied.

## IV.

In Point III, the appellant claims that the trial court erred in submitting Instruction No. 11, the verdict director for the offense of ACA, § 571.015, based on a conviction for the underlying felony of felony murder, because: (1) the State failed to show that he committed the underlying felony by, with, or through the use of a dangerous instrument or deadly weapon, as required by § 571.015 and defined in § 556.061(9), (10), in that the belt used by the appellant in the commission of the underlying felony was not a dangerous instrument or deadly weapon as defined by statute; and (2) § 571.015 is constitutionally infirm as being overbroad and void for vagueness in that it does not give adequate notice and fair warning as to what acts constitute armed criminal action. Before we can address the merits of the appellant's claims in Point III, we must first address the State's contention that, because the appellant did not make a specific objection to the giving of Instruction No. 11 at trial, he did not preserve for appellate review the issues raised in this point.

In this respect, the record reflects that, at the instruction conference, the trial court listed the instructions it proposed giving to the jury and then asked the prosecutor and the appellant's trial counsel

if they wanted to make "[a]ny record on the instructions," to which the appellant's counsel responded:

> Your honor, defendant objects to all of the State's offered instructions on the basis of a Motion for Judgment of Acquittal. We believe it violates my client's rights to due process and a fair trial. To submit the State's instructions would violate those rights protected by the Missouri Constitution and the United States Constitution. And I had a further specific objection as to one of the instructions.

The appellant's counsel then made a specific objection to Instruction No. 7, but made no specific objection to Instruction No. 11. The State contends that, as a result, he waived any appellate review as to the giving of this instruction, including plain error review. The applicable cases that have previously dealt with this issue are somewhat confusing as to what is the state of the law.

In *State v. Martindale*, 945 S.W.2d 669 (Mo.App.1997), the defendant did not object at trial to the submission of the second degree murder instruction. On appeal, the defendant claimed that the trial court "plainly erred" in submitting the instruction because the evidence was insufficient to support its submission. *Id.* at 671–72. The State claimed that the defendant waived any error relating to the giving of the instruction because she did not object to it at trial. The Eastern District of this court held that "if the revised version of Rule 28.03 [7] is to have any effect, the failure to specifically object must constitute a waiver." *Id.* at 673. The court reasoned that "[a] defendant cannot stand idly by, permit the giving of an erroneous instruc-

tion, and then benefit from her inaction." *Id.* The court concluded that the defendant had waived her claim of error regarding the submission of the instruction. *Id.* at 674.

In *State v. McCoy*, 971 S.W.2d 861 (Mo. App.1998), the defendant did not object to the instructions given at trial. *Id.* at 863. On appeal to the Western District of this court, he claimed that the trial court plainly erred when it failed to *sua sponte* instruct the jury on the defense of sudden passion. *Id.* at 862–63. The State contended that, under Rule 28.03, the defendant "waived not only his right to 'assign as error' the failure to give the instruction on sudden passion, but also waived his right to claim plain error," citing *Martindale*. *Id.* at 863 n. 1. In response, the defendant countered that, "although the Eastern District of this court has so held, the Western District has not." *Id.* Because plain error analysis did not change the result of the case, the court declined to decide whether waiver of a claim of error as to the giving of a jury instruction under Rule 28.03 is also a waiver of plain error review. *Id.*

In *State v. Brown*, 996 S.W.2d 719 (Mo. App.1999), the defendant objected at trial to the giving of the felony murder instruction, claiming that it was not supported by the evidence. *Id.* at 725. In his motion for new trial, the defendant objected to the giving of the instruction on the basis that he should have been charged with involuntary manslaughter, not felony murder. *Id.* at 725–26. On appeal to this court, the defendant claimed that the trial court erred in submitting the felony murder instruction because it failed to require the jury to find that he had a culpable mental

7. Missouri Rule of Criminal Procedure 28.03, effective July 1, 1995, governs objections to instructions and verdict forms in criminal cases and provides:

> Counsel shall make specific objections to instructions or verdict forms considered erroneous. No party may assign as error the giving or failure to give instructions or verdict forms unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. Counsel need not repeat objections already made on the record prior to delivery of the instructions and verdict forms. The objections must also be raised in the motion for new trial in accordance with Rule 29.11.

state. *Id.* at 726. The State contended that any claim of error as to the giving of the instruction was not preserved for appellate review, and the court agreed. *Id.* at 726. While the court discussed plain error review, it is unclear as to whether it denied the appellant's claim of error as to the felony murder instruction on the basis that there were no grounds to believe that plain error had occurred or because the defendant had broadened the scope of his objection to the instruction beyond the objection made at trial such that this issue was not preserved for appellate review. *Id.*

The defendant in *Brown* also claimed, in effect, on appeal that the jury instructions given at trial improperly omitted language requiring a jury finding of his persistent offender status. *Id.* at 727. The court held that " '[c]ounsel shall make specific objections to instructions or verdict forms considered erroneous.' " *Id.* (*quoting* Rule 28.03). The court, citing *Martindale*, further held that "[t]he failure to make a specific objection constitutes a waiver," *id.* (*citing Martindale*, 945 S.W.2d at 673), and concluded that, because the defendant had not "specifically preserved an objection to the failure to submit the prior convictions to the jury, and because we cannot determine that he preserved that claim of error in his motion for new trial, . . . [the defendant's] claim of error has not been preserved on appeal." *Id.* at 728. The court did not conduct a plain error analysis of this claim of error.

In *State v. Chambers*, 998 S.W.2d 85 (Mo.App.1999), decided by this court one month after its opinion in *Brown*, 996 S.W.2d at 719, the defendant claimed on appeal that the trial court erred in submitting two jury instructions to the jury and admitted that he failed to object to the instructions before submission, as required by Rule 28.03. *Chambers*, 998 S.W.2d at 88. The court, in a footnote, rejected the

State's argument that it was "precluded from exercising [its] discretion to grant plain error review simply because counsel said he had no specific objection to the instruction, and generally objected to all instructions." *Id.* at 88 n. 1.

Here, the record reflects that, while the appellant's defense counsel made a general objection at trial to all of the instructions submitted by the State, he did not make a specific objection to Instruction No. 11. As in *McCoy*, because, as discussed, *infra*, plain error review would not change the result in this case as to the issues raised in this point, we also decline to decide whether the failure to make a specific objection to a jury instruction at trial, as required by Rule 28.03, precludes plain error review as to such instruction on appeal.

■■■ Rule 30.20,[8] which governs plain error review, provides, in pertinent part, that "[w]hether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." " 'The plain error rule should be used sparingly and does not justify a review of every [alleged] trial error that has not been properly preserved for appellate review.' " *State v. McMillin*, 783 S.W.2d 82, 98 (Mo. banc 1990) (*quoting State v. Valentine*, 646 S.W.2d 729, 731 (Mo.1983)); *see also State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995).

■■■ A plain reading of the rule indicates that plain error review involves a two-step process. Under the rule, the first step involves an examination to determine whether the claim for review "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted,' " or, in other words, whether, on the face of the claim, "plain error" has, in fact, occurred. *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995). In the absence of such a determi-

---

**8.** All rule references are to the Missouri Rules of Criminal Procedure (1998), unless other-   wise indicated.

nation, a court should "decline to exercise its discretion" to review a claim of error under Rule 30.20. *Id.* The rule makes it clear that not all prejudicial error — that is, reversible error — can be deemed plain error. Plain errors are those which are "evident, obvious and clear." *State v. Bailey*, 839 S.W.2d 657, 661 (Mo.App.1992). If plain error is found on the face of the claim, then the rule authorizes, as a matter of court discretion, a second step to determine whether the claimed error resulted in manifest injustice or a miscarriage of justice.

In this case, a careful review of the record as to the trial court's giving of Instruction No. 11 does not reveal obvious and clear error that would result in manifest injustice or a miscarriage of justice. Hence, we decline to review the issue raised by the appellant in his Point III for plain error under Rule 30.20.

Point denied.

## V.

In Point IV, the appellant claims that the trial court abused its discretion in overruling his objection to the State's closing argument regarding the belt used to whip the victim because he was deprived of his constitutional right to a trial before a fair and impartial jury in that the prosecutor argued facts that were not in evidence, prejudicing the jury against him. Specifically, the appellant is complaining about the following argument of the prosecutor:

> What is normal about having this kind of tool, this kind of weapon laying around your home to beat a toddler with? How do you suppose this belt got so frayed? Do you think this happened in one beating? You saw the pictures. You held it in your hands. What kind of force does it take to fray a belt like this? How many times must the defendant have brought this belt down on his son's skin before it came to look like this?

The appellant contends that the prosecutor's remarks were improper because there were no facts in evidence as to how much force it would take to fray the belt.

"A trial court maintains broad discretion in the control of closing arguments." *State v. Middleton*, 995 S.W.2d 443, 455 (Mo.*banc* ), *cert. denied*, — U.S. ——, 120 S.Ct. 598, 145 L.Ed.2d 497 (1999). "Unless that discretion has been clearly abused to the prejudice of the accused, the trial court's ruling should not be disturbed on appeal." *State v. Kriebs*, 978 S.W.2d 460, 466 (Mo.App.1998). A trial court abuses its discretion when its ruling is "clearly against [the] logic of circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Brown*, 998 S.W.2d 531, 540 (Mo. *banc* 1999). "If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Id.* Even if a trial court is found to have abused its discretion by allowing improper closing argument, to warrant reversal of a conviction, the defendant also must establish that such abuse prejudiced him or her. *Deck*, 994 S.W.2d at 543; *State v. Barton*, 936 S.W.2d 781, 786 (Mo. *banc* 1996). To establish prejudice, the defendant must show that there is a reasonable probability that, in the absence of the trial court's abuse, the verdict would have been different. *Deck*, 994 S.W.2d at 543; *Barton*, 936 S.W.2d at 786.

While substantial latitude is allowed during closing argument, the parties may not argue beyond the evidence. *State v. Petty*, 967 S.W.2d 127, 136 (Mo. App.1998). Generally, "[a] prosecutor's arguing facts outside the record is improper and highly prejudicial." *State v. Nelson*, 957 S.W.2d 327, 329 (Mo.App.1997). However, "a trial court may allow an attorney to draw nonevidentiary conclusions as long as those conclusions can be fairly justified as inferences from the evidence." *Kriebs*, 978 S.W.2d at 466. A prosecutor is "entitled to argue reasonable inferences from the evidence." *Middleton*, 995 S.W.2d at 455.

In this case, Dr. Sam Gulino testified at trial that the belt used by the appellant to strike Michael could cause death, but that five or six blows from the belt, because it was frayed at one end, would not have caused Michael's injuries. Instead, it would take a "tremendous number of blows" by the belt to cause his injuries. Dr. Teresa Murdock also testified at trial that the belt used by the appellant to strike Michael could have caused his injuries, but that five or six blows from the belt would not have caused them. She stated that it would take "multiple, multiple whippings with this belt" to cause his injuries. As such, the prosecutor's remarks regarding what kind of force it took to fray the belt and how many times the appellant must have struck his son with it were reasonable inferences from the evidence regarding the events that transpired prior to Michael's death, which the prosecutor was entitled to argue. *Middleton*, 995 S.W.2d at 455. Furthermore, even assuming, *arguendo*, that the trial court abused its discretion in overruling the appellant's objection to the State's closing argument, because the record reflects that there was overwhelming admissible evidence of the appellant's guilt as to his convictions, he failed to show that he was prejudiced by the prosecutor's remarks such that he would be entitled to relief on appeal. *Deck*, 994 S.W.2d at 543; *Barton*, 936 S.W.2d at 786.

Point denied.

## Conclusion

The judgment of the circuit court of the appellant's jury convictions for felony murder in the second degree, § 565.021, endangering the welfare of a child in the first degree, § 568.045, and armed criminal action, § 571.015, is affirmed.

SMART, P.J., and ELLIS, J., concur.